UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

S.B., a minor student, by and through his parents,    )
M.B. and L.H. *et al.*,                               )
                                                      )
    Plaintiffs,                   )
                                                      )
v.                                                    )    No. 3:21-CV-00317-JRG-DCP
                                                      )
GOVERNOR BILL LEE, in his official capacity           )
as Governor of Tennessee, and KNOX COUNTY             )
BOARD OF EDUCATION,                                   )
                                                      )
    Defendants.                   )

## <u>MEMORANDUM OPINION AND ORDER</u>

This matter is before the Court on Plaintiffs' Motion in Support of Preliminary Injunction

[Doc. 9], Plaintiffs' Memorandum in Support of Motion for Preliminary Injunction [Doc. 9-1],

Defendant Knox County Board of Education's Response in Opposition [Doc. 14], Defendant

Governor Bill Lee's Response in Opposition [Doc. 17], Plaintiffs' Supplemental Authority in

Support of Motion for Preliminary Injunction [Doc. 27], Knox County Board of Education's

Memorandum Regarding Supplemental Authority [Doc. 28], and Governor Lee's Response to

Plaintiffs' Supplemental Authority [Doc. 31]. For the reasons herein, the Court will grant

Plaintiffs' motion.

## I.  Background

On August 16, 2021, the Governor of Tennessee, Bill Lee, issued Executive Order No.

84, which states:

> I, Bill Lee, Governor of the State of Tennessee, having declared a continuing state
> of emergency by Executive Order No. 83, dated August 6, 2021, and by virtue of
> the power and authority vested in me by the Tennessee Constitution and other
> applicable law including Tennessee Code Annotated § 58-2-107, do hereby order
> that a student's parent or guardian shall have the right to opt out of any order or

requirement for a student in kindergarten through twelfth-grade to wear a face covering at school, on a school bus, or at school functions, by affirmatively notifying in writing the local education agency or personnel at the student's school.

[Executive Order No. 84, Doc. 23]. Not long afterwards, the Knox County Board of Education, in response to the ongoing COVID-19 pandemic, met on September 1, 2021, to discuss and vote on a district-wide mask mandate for its school system, [Am. Compl., Doc. 7, ¶ 52],[1] which consists of ninety schools and 60,000 students, [Hr'g Tr. at 179:24–25, 180:1–6 (on file with the Court)].[2] Approximately 8,000 of those students are disabled. [*Id.* at 180:7–14]. By vote of the board, a mask mandate had been in effect during the entirety of the previous school year, from August 2020 to May 2021, for all ninety schools. [*Id.* at 206:15–25]. But this year, during the board's meeting on September 1, 2021, it decided not to renew the mask mandate by a vote of 5 to 4, [Am. Compl. ¶ 54]—acting at odds with the guidelines of the Knox County Health Department, the American Academy of Pediatrics, and the Centers for Disease Control and Prevention ("CDC"), all of which recommend masks for all students enrolled in kindergarten through twelfth grade, [Dr. Yaun Decl., Doc. 9-3, ¶ 12; Hr'g Tr. at 55:21–25, 56:1, 69:5–7].[3]

In response to the board's vote, Plaintiffs, on the following day, brought a class-action lawsuit in this Court under Title II of the Americans with Disabilities Act of 1990 ("ADA), 42 U.S.C. § 12131 *et seq.*, and § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, claiming they are "unable to *safely* attend school without increased risks of serious injury or even death,

---

[1] Plaintiffs amended complaint is verified under 28 U.S.C. § 1746, *see El Bey v. Roop*, 530 F.3d 407, 414 (6th Cir. 2008) (noting that a "verified complaint" is one that is signed under the penalty of perjury under 28 U.S.C. § 1746), and the Court may therefore rely on it as evidence, *see Barron v. PGA Tour, Inc.*, 670 F. Supp. 2d 674, 677 n.3 (W.D. Tenn. 2009) (stating that "the court may rely on facts contained in affidavits and verified complaints in deciding whether to issue a temporary restraining order or preliminary injunction" (citing Fed. R. Civ. P. 65(b)(1)(A))).

[2] The Court has relied on an uncertified copy of the transcript, which it received from the court reporter immediately after the evidentiary hearing. It does not exactly match the line numbers and page numbers in the certified copy of the transcript that was recently filed in the record. The two copies are otherwise consistent with each other.

[3] On August 11, 2021, the Knox County Board of Health recommended masking indoors regardless of vaccination status. [Hr'g Tr. at 69:5–7].

unlike their non-disabled peers," [Am. Compl. ¶ 54 (emphasis in original)]. Plaintiffs allege that they suffer from underlying medical conditions that expose them to a likelihood of severe illness or death from COVID-19, a highly transmissible and sometimes deadly virus that invades the body through the mouth, nose, and eyes and spreads through respiratory droplets that persons produce by speaking, coughing, or sneezing. [Hr'g Tr. at 51:2–25, 52:1–6, 103:8–9]. Children under the age of twelve are not yet eligible to receive COVID-19 vaccines, and some children who are old enough to receive the vaccines may have medical conditions that do not allow their immune systems to sufficiently respond to them. [Dr. Yaun Decl. ¶¶ 21–22].

A ten-year-old fourth grader, Plaintiff T.W. has only one heart ventricle, a congenital defect that impairs his cardiovascular and immune functions, and he also suffers from epilepsy. [Am. Compl. ¶¶ 25–26]. He has undergone multiple open-heart surgeries. [*Id.* ¶¶ 25– 26]. A twelve-year-old sixth grader, Plaintiff M.S. suffers from "Joubert Syndrome, a rare genetic disorder involving brain malformation" that results in cognitive impairments. [*Id.* ¶¶ 22–24]. She is confined to a wheelchair. [*Id.* ¶ 24].[4] An eight-year-old second grader, Plaintiff S.B. suffers from chronic lung disease, Eosinophilic Esophagitis (a chronic immune-system disease of the esophagus), autoimmune disease, and autism. [*Id.* ¶¶ 19–21]. An eleven-year-old sixth grader, Plaintiff M.K. has asthma and is on the Knox County School System's "Asthma Action Plan," an emergency plan. [*Id.* ¶¶ 27–28]. All Plaintiffs are zoned within the public school system of the Knox County Schools. [*Id.* ¶¶ 3, 6, 9, 12].

Plaintiffs claim that the Knox County Board of Education has violated the ADA and the Rehabilitation Act by not providing them with a reasonable accommodation that would enable them—against the backdrop of the COVID-19 pandemic—to have safe and "fundamental access

---

[4] During the evidentiary hearing, the parties stipulated that M.S. has now been vaccinated. [*Id.* at 121:8–25, 122:1–25].

to the school building itself." [*Id.* ¶ 55]. Specifically, Plaintiffs cite an "urgent need" for a mask mandate inside Knox County Schools and allege the reasonable accommodation "being sought in this case is *community masking: protection of selves and others.*" [*Id.* ¶¶ 40, 51 (emphasis in original)]. According to Plaintiffs, the Knox County Board of Education's rejection of a mask mandate is placing them at an "increased risk of serious injury or death by not allowing a simple reasonable modification under the ADA and Rehabilitation Act." [*Id.* ¶ 60]. Also, Plaintiffs claim that Governor Lee has violated the ADA and the Rehabilitation Act because, by promulgating Executive Order No. 84, he denied the Knox County Board of Education "the ability to provide the children with disabilities in the instant matter with the protections they need to attend school safely." [*Id.* ¶ 68].

Plaintiffs bring suit on behalf of all "current and future K-12 students" who are "eligible to attend public school in Knox County, Tennessee, during the coronavirus pandemic," who are unable to receive the vaccine or unable to mount an adequate immune response to the vaccine, and who suffer from one or more of the following medical conditions:

> (a) lung disease, including asthma, chronic obstructive pulmonary disease (*e.g.*, bronchitis or emphysema), or other chronic conditions associated with impaired lung function;
> (b) heart disease, such as congenital heart disease, congestive heart failure and/or coronary artery disease;
> (c) chronic liver or kidney disease (including hepatitis and dialysis patients);
> (d) diabetes or other endocrine disorders;
> (e) hypertension;
> (f) compromised immune systems (such as from cancer, HIV, receipt of an organ or bone marrow transplant, as a side effect of medication, or other autoimmune disease);
> (g) blood disorders (including sickle cell disease);
> (h) inherited metabolic disorders;
> (i) history of stroke;
> (j) neurological or developmental disability (including epilepsy);
> (k) cancer or cancer treatments; and/or
> (l) muscular dystrophy or spinal cord injury.

[*Id.* ¶ 58; *see* Dr. Yaun Decl. ¶ 18 (stating that children with these medical conditions are "more likely to face severe symptoms, require hospitalization, and potentially die" from COVID-19)].

Plaintiffs now move the Court to issue a preliminary injunction[5] that "requir[es] Knox County Board of Education to enforce a mask mandate" and that "enjoin[s] Governor Lee during this litigation from enforcing Executive Order No. 84." [Am. Compl. ¶ 77].[6] Last week, the Court held a hearing on Plaintiffs' motion for a preliminary injunction. The Court heard from several witnesses during the hearing, including Ms. Ashley Paquette, Jason Yaun, M.D., Jennifer Ker, M.D., Jon Rysewik, Ph.D., and Mr. Jason Myers.

Ms. Paquette is a fifth-grade teacher in the Knox County School System and teaches at Farragut Intermediate School. A licensed, board-certified pediatrician, Dr. Yaun is an associate professor of pediatrics at the University of Tennessee Health Sciences Center and practices medicine with the University of Tennessee Le Bonheur Pediatric Specialists in Memphis, where he treats children who are infected with COVID-19. [Hr'g Tr. at 48:5–11, 49:14–16]. A licensed, board-certified immunologist, Dr. Ker is an assistant clinical professor of allergy, pulmonary, and critical-care medicine at the Vanderbilt University Medical Center and practices medicine in Nashville and Brentwood. [Hr'g Witness List, Doc. 25, at 2]. She also treats children who are infected with COVID-19 and who, in some instances, have immune systems that function poorly. [Hr'g Tr. at 97:13–24, 98:20–22]. Ms. Paquette, Dr. Yaun, and Dr. Ker testified on Plaintiffs' behalf. Dr. Rysewik and Mr. Myers appeared on the Knox County Board of Education's behalf. Dr. Rysewik is the chief academic officer and assistant superintendent for Knox County Schools,

---

[5] In a class-action lawsuit, the Court has license to issue a class-wide preliminary injunction before ruling on class certification. *See Gooch v. Life Investors Ins. Co. of Am.*, 672 F.3d 402, 433 (6th Cir. 2012) ("[T]here is nothing improper about a preliminary injunction preceding a ruling on class certification.").

[6] Plaintiffs amended complaint is misnumbered between pages sixteen and eighteen.

and Mr. Myers is the executive director of student support for Knox County Schools. [*Id.* at 178:21–22, 217:18–19].

The parties have now fully briefed the Court on their respective arguments for and against the entry of a preliminary injunction. Having carefully reviewed and considered those arguments, the Court is now prepared to rule on Plaintiffs' motion.

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 65, "[t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). When considering whether to issue a preliminary injunction, the Court considers four factors: (1) whether the movant has shown a strong likelihood of success on the merits of the controversy, (2) whether the movant is likely to suffer irreparable harm without an injunction, (3) whether an injunction would cause substantial harm to others, and (4) whether an injunction would serve the public interest. *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).

A preliminary injunction, however, is an "extraordinary remedy," and the movant has the "burden of proving that the circumstances clearly demand it." *Id.* (citation omitted). "[T]he proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion," *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000) (citations omitted), because on a motion for a preliminary injunction, the movant has a "burden of persuasion as to all of the four prerequisites," whereas a plaintiff on a motion summary judgment has only the task of creating a genuine issue of material fact for a jury's consideration. *Stenberg v. Cheker Oil Co.*, 573 F.2d 921, 925 (6th Cir. 1978). Even so,

6

"[a] party . . . is not required to prove his case in full at a preliminary-injunction hearing." *Univ.*

*of Tex.*, 451 U.S. at 395.

The four factors generally ought "to be balanced against one another and should not

be considered prerequisites to the grant of a preliminary injunction." *Leary*, 228 F.3d at 736

(citations omitted). When the Court, however, is able to determine the propriety of a preliminary

injunction by relying on fewer than all four factors, it may do so. *See Certified Restoration Dry*

*Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007) ("The district judge

'is not required to make specific findings concerning each of the four factors used in determining

a motion for preliminary injunction if fewer factors are dispositive of the issue.'" (quotation

omitted)); *Mascio v. Pub. Emps. Ret. Sys. of Ohio*, 160 F.3d 310, 315 (6th Cir. 1998) (affirming

the district court's issuance of a preliminary injunction based on the district court's conclusion

that the plaintiff showed a likelihood of success on the merits).

### III. ANALYSIS

The Court is compelled to begin by framing the claims and the legal issues because all

three of the parties characterize them differently. The Knox County Board of Education asserts

that "the issue is whether" its vote "to not have a mask mandate is a denial of a reasonable

accommodation to Plaintiffs," and it argues that this issue "presents a political question which

should not be resolved by the Court." [Knox Cty. Sch. Bd.'s Resp. at 2]; *see generally Japan*

*Whaling Ass'n v. Am. Cetacean Soc.*, 478 U.S. 221, 230 (1986) ("The political question doctrine

excludes from judicial review those controversies which revolve around policy choices and value

determinations constitutionally committed for resolution to the halls of Congress or the confines

of the Executive Branch."); *U.S. ex rel. Joseph v. Cannon*, 626 F.2d 1373, 1379 (D.C. Cir. 1981)

7

("[C]ourts are fundamentally underequipped to formulate national policies or develop standards of conduct for matters not legal in nature." (footnote omitted)).

Governor Lee, on the other hand, argues that "[t]he First Amended Complaint indicates that this case is about the suitability of Plaintiffs' educational program, not physical access to the school." [Governor Lee's Resp. at 1]. "Plaintiffs' filings," Governor Lee argues, "clearly speak to the appropriateness of education, not access," [*id.*], so in his view, "the crux of their complaint is that they are being denied" a free public education and, therefore, the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 401 *et seq.*, governs their claims. [*Id.* at 8]. The IDEA provides that "children with disabilities have a right to a 'free appropriate public education'" and "concerns the 'denial of a free appropriate public education.'" *Perez v. Sturgis Public Schs.*, 3 F.4th 236, 239, 240 (6th Cir. 2021) (quoting 20 U.S.C. § 412(a)(1)). According to Governor Lee, the Court lacks jurisdiction over Plaintiffs' claims because Plaintiffs have not exhausted their administrative remedies under the IDEA. [Governor Lee's Resp. at 8].

But what do Plaintiffs say about their claims? After all, they are the masters of their complaint. *See Energy Conversion Devices Liquidation Tr. v. Trina Solar Ltd.*, 833 F.3d 680, 688 (6th Cir. 2016) ("As the master of the complaint, the plaintiff may decide what claims to bring and how to prove them."). Plaintiffs allege that they are "unable to *safely* attend school without increased risk of serious injury or even death, unlike their non-disabled peers," because they would be "in close proximity to unmasked students in hallways, bathrooms, the cafeteria, the gym, the playground, on buses, and in classrooms, and are exposed to a substantial likelihood or risk of serious injury or even death." [Am. Compl. ¶ 54 (emphasis in original)]. According to Plaintiffs, "[t]his action, therefore, is not to make changes in educational programming, but rather to enable these children to have fundamental *access* to the school building itself." [*Id.* ¶ 55

8

(emphasis in original)]. Again, based on these allegations, Plaintiffs bring claims against Defendant under two statutes: the ADA and the Rehabilitation Act.[7]

The ADA provides a "broad mandate" to "eliminate discrimination against disabled individuals," with the aim of "integrat[ing] them 'into the economic and social mainstream of American life,'" *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675 (2001) (quotations omitted), and in the ADA, "Congress noted that the many forms such discrimination takes include 'outright intentional exclusion' as well as the 'failure to make modifications to existing facilities and practices,'" *Id.* (quoting 42 U.S.C. § 12101(a)(5)). When a state entity like a board of education fails to make reasonable modifications to its facilities and practices, a party may sue the board of education by bringing a claim known as a failure-to-accommodate claim under the ADA. "A failure-to-accommodate claim asserts that the defendant 'could have reasonably accommodated [a plaintiff's] disability, but refused to do so.'" *Keller v. Chippewa Cty., Mich. Bd. of Comm'rs*, ___ F. App'x ___, 2021 WL 2411873, at *3 (6th Cir. 2021) (quoting *McPherson v. Mich. High Sch. Athletic Ass'n*, 119 F.3d 453, 460 (6th Cir. 1997).

The purpose of a reasonable accommodation is to enable a disabled individual to have, like his non-disabled peers, meaningful access to government services, programs, and activities. *Ability Ctr. of Greater Toledo v. City of Sandusky*, 385 F.3d 901, 907, 909–10 (6th Cir. 2004)). In cases involving questions of meaningful access, one circuit court of appeals has observed that they "reflect, in light of Supreme Court guidance, a general pattern: Where the plaintiffs identify an obstacle that impedes their access to a government program or benefit, they likely have established that they lack meaningful access to the program or benefit." *Am. Council of the Blind*

---

[7] The Court will go on to discuss how the ADA and the Rehabilitation Act are largely coextensive with each other and how claims under either statute, more often than not, do not require separate analyses.

9

*v. Paulson*, 525 F.3d 1256, 1267 (D.C. Cir. 2008). The Court sees shades of this general pattern here in Plaintiffs' case.

This case requires the Court to consider the ADA's mandate of social integration in an unprecedented context by addressing how a board of education must reasonably accommodate medically compromised students when COVID-19 is now part of daily life inside their schools' walls. The record evidence shows that an encounter with COVID-19 would likely be fatal to Plaintiffs, and right now, as Plaintiffs' attorney stated at last week's evidentiary hearing, Knox County Schools are "on fire" with COVID-19. Is the invisible barrier that COVID-19 places between Plaintiffs and their classrooms necessarily any different from a physical barrier that a stairwell places between wheelchair-bound students and their classrooms? In other words, does the ADA require a board of education to make reasonable accommodations to curb COVID-19 so that highly vulnerable individuals like Plaintiffs can physically enter their school buildings, just as the ADA requires a board of education to construct a ramp so that wheelchair-bound students can physically enter their school buildings? "After all, if the child cannot get inside the school," for whatever the reason, then "he cannot receive instruction there" and "he may not achieve the sense of independence conducive to academic (or later to real-world) success." *Fry v. Napoleon Cmty. Schs.*, 137 S. Ct. 743, 756 (2017).

*These* are the sorts of questions and issues this case presents for the Court's deliberation. Plaintiffs' claim is a failure-to-accommodate claim under the ADA, and the Court will address it as one. The Court has no intention of expressing approbation or disapprobation—or passing editorial remarks of any kind—relating to the "policy choices" or "value determinations" of the Knox County Board of Education's vote against a mask mandate or Governor Lee's decision to allow parents to opt their children out of mask mandates. Neither of these issues is before the

Court, so the Court is in no position to engage in "policy choices and value determinations." *Japan Whaling Ass'n*, 478 U.S. at 230.

And as for the IDEA, although Governor Lee is correct that parties must exhaust the IDEA's administrative procedures before bringing suit in federal court for "the denial of a free appropriate public education," often referred to as "FAPE," *Perez*, 3 F.4th at 240 (quoting 20 U.S.C. § 412(a)(1)), he does not convince the Court that the IDEA's exhaustion requirement applies in this case. The relevant portion of the IDEA's exhaustion requirement states:

> Nothing in [the IDEA] shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the [ADA], title V of the Rehabilitation Act [including § 504], or other Federal laws protecting the rights of children with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under [the IDEA], the [IDEA's administrative procedures] shall be exhausted to the same extent as would be required had the action been brought under [the IDEA].

*Fry* , 137 S. Ct. at 750 (alterations in original) (quoting 20 U.S.C. § 1415(*l*)). This exhaustion requirement means that a party "can sue under 'other [f]ederal laws protecting the rights of children with disabilities'—including the ADA—but he or she must first complete the IDEA's full administrative process." *Perez*, 3 F.4th at 240 (quoting 20 U.S.C. § 1415(*l*)). A lawsuit must first satisfy the IDEA's exhaustion requirement if it "seek[s] relief that is also available under [the IDEA]." 20 U.S.C. § 1415(*l*).

In determining whether Plaintiffs are actually seeking relief that is also available under the IDEA, the Court must look at the "substance" and not the "surface" of their allegations; in other words, "[w]hat matters" is whether "the crux" of Plaintiffs' allegations is the denial of a FAPE. *Fry*, 137 S. Ct. at 755. In arriving at an answer to the question of whether a plaintiff is really seeking relief for the denial of a FAPE, the Supreme Court has instructed courts to ask a pair of hypothetical questions:

11

First, could the plaintiff have brought essentially the same claim if the alleged conduct had occurred at a public facility that was *not* a school—say, a public theater or library? And second, could an *adult* at the school—say, an employee or visitor—have pressed essentially the same grievance? When the answer to those questions is yes, a complaint that does not expressly allege the denial of a FAPE is also unlikely to be truly about that subject; after all, in those other situations there is no FAPE obligation and yet the same basic suit could go forward. But when the answer is no, then the complaint probably does concern a FAPE, even if it does not explicitly say so[.]

*Id.* at 756. In Plaintiffs' case, the answer to both hypothetical questions is yes. The crux of Plaintiffs' allegations is safe access to public, brick-and-mortar government buildings and not the denial of a FAPE. *See* [Am. Compl. ¶ 54 (seeking "to *safely* attend school without increased risks of serious injury or even death, unlike their non-disabled peers" (emphasis in original); *id.* (seeking "fundamental *access* to the school building itself"); *id.* ¶ 55 (requesting a reasonable accommodation that would "enable these children to have fundamental *access* to the school building itself" (emphasis in original)); *id.* ¶ 56 (alleging that Plaintiffs face "an impossible dilemma" of "risk[ing] their health" by entering schools to obtain an education)]; *see also* [*id.* ¶ 30 (expressing concern about safety because "[i]n Knox County public schools, COVID-19 and its 'Delta variant' are rapidly spreading"); *id.* ¶ 40 (stating that the "reasonable modification being sought . . . is *community masking*" (emphasis in original)); *id.* ¶ 68 (decrying "Governor Lee's Executive Order" because it "is denying local school districts the ability to provide the children with disabilities in the instant matter with the protections they need to attend school *safely*" (emphasis added))]. A medically compromised teacher, custodian, parent, grandparent, or visitor could bring an identical grievance in this case, whether based on safe and equal access to Knox County Schools or to another public, government building like a library or post office. As the Supreme Court stated in *Fry*:

Title II of the ADA and § 504 of the Rehabilitation Act cover people with disabilities of all ages, and do so both inside and outside schools. And those statutes

aim to root out disability-based discrimination, enabling each covered person (sometimes by means of reasonable accommodations) to participate equally to all others in public facilities[.]

. . . .

[I]f the child cannot get inside the school . . . is the denial of a FAPE really the gravamen of the plaintiff's Title II complaint? Consider that the child could file the same basic complaint if a municipal library or theater had no ramps. And similarly, an employee or visitor could bring a mostly identical complaint against the school. That the claim can stay the same in those alternative scenarios suggests that its essence is equality of access to public facilities, not adequacy of special education.

*Fry*, 137 S. Ct. at 756.

Plaintiffs were therefore not obligated to exhaust the IDEA's administrative procedures before filing suit in this Court under the ADA. Again, their claim is a failure-to-accommodate claim under the ADA. They request an accommodation of a community-wide mask mandate in Knox County Schools so they can safely access their school buildings. Knox County Board of Education argues that reasonable accommodations are already in place to protect Plaintiffs from COVID-19 in Knox County Schools, and even if they were not, it maintains that it has afforded them a reasonable alternative accommodation in the form of virtual learning. Plaintiffs disagree. Governor Lee contends that Plaintiffs lack standing to sue him and, alternatively, lack viable claims because Executive Order No. 84 is not "an impediment . . . to a safe school environment." [Governor Lee's Resp. at 7]. Plaintiffs disagree. These are the issues before the Court. But, before it can consider them, it must first address the Knox County Board of Education's and Governor Lee's arguments that this case is not ripe for resolution and that Plaintiffs are without standing, respectively.[8]

---

[8] Plaintiffs have not replied to Defendants' respective arguments on standing and ripeness, but the Court may sua sponte address standing and ripeness because both are determinative of the Court's jurisdiction. *Loren v. Blue Cross & Blue Shield of Mich.*, 505 F.3d 598, 607 (6th Cir. 2007); *Arnett v. Myers*, 281 F.3d 552, 562 (6th Cir. 2002).

13

### A. Standing

A constitutional requirement under Article III, standing is "the threshold question in every federal case." *Warth v. Seldin*, 422 U.S. 490, 498 (1975); *see Chapman v. Tristar Prod., Inc.*, 940 F.3d 299, 304 (6th Cir. 2019) ("We may not decide the merits of a claim for relief unless some party pressing the claim has standing to bring it." (citing *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650–51 (2017))). To attain standing, Plaintiffs have to show that they "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citation omitted).[9]

Governor Lee challenges the second element of standing, arguing that "Plaintiffs cannot show their alleged harm is fairly traceable to" Executive Order No. 84. [Governor Lee's Resp. at 4]. Traceability does not "concern whether the defendant 'caused' the plaintiff's injury in the liability sense," *Wuliger v. Mfrs. Life Ins. Co.*, 567 F.3d 787, 796 (6th Cir. 2009), because it " is not synonymous with causation sufficient to support a claim," *Parsons v. U.S. Dep't of Justice*, 801 F.3d 701, 715 (6th Cir. 2015). Also, traceability does not require Governor Lee's executive order to be a proximate cause of Plaintiffs' alleged injury. *Id.* at 713. In other words, Governor Lee's executive order need not have "a close connection" to Plaintiffs' alleged injury, *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133 (2014); rather, it need only be "fairly traceable" to their alleged injury. *Spokeo*, 136 S. Ct. at 1547. In Governor Lee's view, Plaintiffs' alleged injury is not fairly traceable to his executive order because the Knox County

---

[9] To demonstrate standing to pursue injunctive relief, Plaintiffs must also show a real and immediate threat of a future injury. *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974). Governor Lee, however, neither mentions nor challenges this aspect of standing. In any case, the Court goes on to address the threat of immediate harm to Plaintiffs in its analysis of the irreparable-harm element under Rule 65. *See Memphis A. Philip Randolph Inst. v. Hargett*, 978 F.3d 378, 393 (6th Cir. 2020) (combining an analysis of "whether the plaintiffs have standing" with an analysis of whether "the plaintiffs are . . . facing a certain and immediate risk of harm" under Rule 65).

14

Board of Education "does not even have a mask mandate to opt out from" and the injury that Plaintiffs complain of "is entirely dependent on third parties choosing not to wear masks." [*Id.*]. The gist of Governor Lee's argument is that Executive Order No. 84 has no bearing on this case unless the Knox County Board of Education and the parents of students first act in a way that triggers the executive order's operative language.

Again, the executive order states that "a student's parent or guardian shall have the right to opt out of any order or requirement for a student in kindergarten through twelfth-grade to wear a face covering at school." [Executive Order No. 84]. Governor Lee asserts that Plaintiffs' alleged injury is not traceable to this language unless two things happen: (1) the Knox County Board of Education adopts a "requirement for a student in kindergarten through twelfth-grade to wear a face covering at school" and (2) the parents of students exercise "the[ir] right to opt out of" that requirement. [*Id.*]. If either one of these third-party actions has yet to occur, then Governor Lee could have a point because the Supreme Court has expressed "reluctance to endorse standing theories that rest on speculation about the decisions of independent parties." *Clapper v. Amnesty Int'l, Inc.*, 568 U.S. 398, 414 (2013); *see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (stating that an injury must be fairly traceable to the challenged action of the defendant and not the result of "the independent action of some third party not before the court").

But the Court has to ask, why would a board of education bother acting to adopt a mask mandate when Governor Lee's executive order allows students not to comply with it? Governor Lee's executive order reduces any board of education's mask mandate to a mere paper tiger. Just consider the facts in a similar case, *G.S. by and through Schwaigert v. Lee*, ___ F. Supp. 3d ___, 2021 WL 4057812 (W.D. Tenn. Sept. 3, 2021). In that case, the Shelby County Department of Health entered an order requiring "all K-12, Pre-K schools, and Daycare facilities to require

15

universal indoor masking for all teachers, staff, students, and visitors to the schools, regardless of vaccination status." *Id.* at *3. But afterwards, Governor Lee issued Executive Order No. 84, so the Shelby County Department of Health abandoned its mask mandate, viewing Governor Lee's executive order as an executive "exception" to it. *Id.*; *see G.S. by and through Schwaigert v. Lee*, No. 2:21-cv-02552-SHL-ATC, at 7 (W.D. Tenn. Sept. 17, 202) (PACER) ("As a result of Executive Order No. 84, local education agencies . . . falling under the jurisdiction of Shelby County Health Department's directive could no longer require all students to be masked.").

Something is akilter with this scenario, and Plaintiffs are on to it. They maintain that Governor Lee's executive order is harming them because it "denie[s] local school districts the ability to provide" them with "a simple reasonable modification" under the ADA: a community mask mandate, without which they cannot "attend school safely" and are "at increased risk of serious injury or death." [Am. Compl. ¶¶ 60, 68]. In addition, they allege that the Knox County Board of Education "has let parents 'decide for themselves,' *pursuant to* the Executive Order." [*Id.* ¶ 60 (emphasis added)]. The Knox County Board of Education seems to agree with these allegations, noting that it "considered" Governor Lee's executive order during its last meeting and determined that "no universal mask mandate can be put into place by the Board." [Knox Cty. Bd. of Educ.'s Resp. at 7]. And in fact, during the evidentiary hearing, Governor Lee's counsel conceded that the executive order creates a procedural catch-22 that prevents the Knox County Board of Education from providing the accommodation that Plaintiffs seek:

> The Court: If the governor's order is not set aside, Knox County can never comply with its responsibility—Knox County schools can never comply with its responsibilities under the ADA?
>
> Ms. Morse: I do not believe that a mask mandate is required by the ADA.
>
> The Court: Well, that's a different question. Let's assume that it is.

16

Ms. Morse: Correct.

The Court: Let's assume that there is a remedy under the ADA that may or may not include masking.

Ms. Morse: Certainly they could not offer an effective accommodation.

The Court: They could not offer the accommodation.

Ms. Morse: Yes, Your Honor.

[Hr'g Tr. at 19:7–22]. The record—from the pleadings, to the parties' briefs, to the evidentiary hearing—therefore smacks of an injury traceable to Governor Lee's executive order because it shows that the executive order foreclosed the Knox County Board of Education from adopting a mask mandate, the alleged reasonable accommodation that Plaintiffs request under the ADA. Under Governor Lee's executive order, any board-approved mask mandate is a de facto no-mask mandate.

The traceability of Plaintiffs' injury to Governor Lee's executive order becomes even more pronounced when the Court considers that standing "often turns on the nature and source of the claim asserted." *Warth*, 422 U.S. at 500. The ADA is a civil-rights statute, *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 322 (6th Cir. 2012) (Clay, J., concurring in part and dissenting in part); *Chapman v. Pier 1 Imps. (U.S.), Inc.*, 631 F.3d 939, 946 (9th Cir. 2011), and the Court must "take a broad view of constitutional standing in civil rights cases, especially where, as under the ADA, private enforcement suits 'are the primary method of obtaining compliance with the Act.'" *Chapman*, 631 F.3d at 946 (quoting *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 209 (1972). And similarly, when a case like this one involves an executive-branch official and alleged wrongdoing that implicates the "rights and liberties of individual citizens . . . against . . . *discriminatory* government," the need for judicial review is arguably at its zenith. *Raines v. Byrd*, 521 U.S. 811, 829 (1997) (emphasis added) (quotation omitted).

17

Under a broad view, or really any view, the Knox County Board of Education's failure to prospectively adopt a mask mandate—the alleged reasonable accommodation—*is* an injury, a concrete, actual, and ongoing injury, for which Governor Lee's executive order is a traceable cause. Governor Lee's shrewd argument to the contrary is an attempt to halt Plaintiffs' pursuit of an alleged reasonable accommodation under the ADA. *See Jacobs v. Barr*, 959 F.2d 313, 316–17 (D.C. Cir. 1992) (rejecting the defendant's "ingenious theory" on standing because it "ha[d] the effect of barring most equal protection challenges even before they have been presented" (citing *McCarthy v. Madigan,* 503 U.S. 140 (1992))). Standing requires the Court to determine whether the "door to federal court" is open to a plaintiff, *Buchholz v. Myer Njus Tanick*, 946 F.3d 855, 862 (6th Cir. 2020), but Governor Lee aims to stop Plaintiffs from even reaching the door's threshold so that the Court can make that determination. Because his executive order forestalls Plaintiffs from pursuing an alleged reasonable accommodation under the ADA, the Court clearly has license to enjoin his executive order and is likely to do so. *See Milliken v. Bradley*, 433 U.S. 267, 289 (1977) (affirming an injunction requiring state officials to "conform their conduct to the requirements of federal law"); *cf. Bd. of Trs. of Univ. of Al. v. Garrett*, 531 U.S. 356, 374 n.9 (2001) ("Title I of the ADA . . . prescribes standards applicable to the States" and "can be enforced by . . . private individuals in actions for injunctive relief[.]"). Plaintiffs have therefore satisfied the elements of standing.

### B. Ripeness

Under the Constitution, the Court's judicial power to resolve disputes starts and ends with actual "cases" and "controversies," the two terms from which the ripeness doctrine originates. U.S. Const. art. III, § 2. The purpose of the ripeness doctrine is to "prevent the courts, through premature adjudication, from entangling themselves in abstract disagreements." *Cassim v. Educ.*

*Credit Mgmt. Corp.*, 594 F.3d 432, 437 (6th Cir. 2010) (quoting *Ky. Press Ass'n v. Kentucky*, 454 F.3d 505, 509 (6th Cir. 2006). Simply put, it forbids federal courts from resolving hypothetical or speculative disputes, *id.*; *Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 280 (6th Cir. 1997)—that is, disputes in which an injury is "dependent on 'contingent future events that may not occur as anticipated, or indeed may not occur at all,'" *Trump v. New York*, 141 S. Ct. 530, 535 (2018).

The Knox County Board of Education contends that Plaintiffs' claims against it are not ripe for resolution because "[i]t is uncertain if [it] would adopt a mask mandate were [Governor Lee's] opt-out order not in effect, and any such pronouncement would be speculative." [Knox Cty. Bd. of Educ.'s Resp. at 7]. So in its view, the alleged "inaction" in this case—its failure to adopt a mask mandate—has "not yet occurred." [*Id.* at 7–8]. But the relevant question is not whether it "*would* adopt a mask mandate," [*id.* at 7 (emphasis added)]—that is a question of whether the *remedy* that Plaintiffs request will come to pass, not whether *harm* to Plaintiffs will come to pass. *See United Steelworkers of Am., Local 2116 v. Cyclops Corp.*, 860 F.2d 189, 194 (6th Cir. 1988) ("In undertaking a ripeness analysis, we . . . . pay particular attention to the likelihood that the *harm* alleged by plaintiffs will ever come to pass." (emphasis added) (citations omitted)). The relevant question is whether the Knox County Board of Education has declined to adopt a mask mandate.

Even while Governor Lee's executive order was in effect, the Knox County Board of Education convened a special meeting to discuss and vote on a mask mandate, and it formally voted against one. So, it *did* in fact act, and it acted against a mask mandate, and importantly, it is—right now—adhering to its own board-approved policy that does not require masking in its schools. [Hr'g Tr. at 180:20–21, 219:19–22]; *see Ammex, Inc. v. Cox*, 351 F.3d 697, 706 (6th Cir.

2003) (pointing out that the ripeness doctrine "arises most clearly" when a party is seeking to enjoin a policy that has "*not* yet been forced against them" (emphasis added)).

Simply, the Knox County Board of Education's formal vote and policy against mask-wearing and Governor Lee's executive order can both harm Plaintiffs under the ADA at the same time, making their claims as to each ripe. If the accommodations that the Knox County Board of Education currently has in place to combat COVID-19 are not, in lieu of a mask mandate, reasonable accommodations, it will be in violation of the ADA, in which case the Court has charter to enjoin its decision not to enact a mask mandate. *See Mayberry v. Von Valtier*, 843 F. Supp. 1160, 1166 (E.D. Mich. 1994) (stating that "Congress appears to have intended the ADA to address the discriminatory effects of benign actions or *inaction*" (emphasis added)); *see also* 42 U.S.C. § 12131(1)(A)–(B) (stating that Title II of the ADA applies to "any State or local government" or "any department, agency, special purpose district, or other instrumentality of a State or States or local government"). The Court, therefore, in enforcing the ADA to redress Plaintiffs' alleged harms, would not be engaging in premature adjudication.

Besides, the Sixth Circuit has recognized that an analysis of ripeness consists of three "key" factors, *Dealer Computer Servs. v. Dub Herring Ford*, 547 F.3d 558, 561 (6th Cir. 2008), which are:

> 1) the likelihood that the harm alleged by the plaintiffs will ever come to pass; 2) whether the factual record is sufficiently developed to produce a fair adjudication of the merits of the parties' respective claims; and 3) the hardship to the parties if judicial relief is denied at this stage in the proceedings.

*Ky. Press Ass'n, Inc. v. Kentucky*, 454 F.3d 505, 509 (6th Cir. 2006) (quotation and internal quotation marks omitted); *see Ammex*, 351 F.3d at 706 ("Recent holdings of the Supreme Court make clear the continuing validity in that context of the three-part test for ripeness[.]" (citations

omitted)).[10] The Knox County Board of Education does not cite this three-factor test or conduct an analysis under all its factors, and its failure to do so is, by itself, fatal to its argument that Plaintiffs' claims are not ripe. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." (alteration in original) (quotation omitted)).

In any case, Plaintiffs satisfy the three-factor test for ripeness. Under the first factor, the evidence shows—as the Court will go on to discuss in detail—that Plaintiffs lack safe access to their school buildings without a mask mandate because the Knox County Board of Education's current efforts to curtail the spread of COVID-19 are ineffective, the Delta variant is resulting in increased transmissibility of the virus, and infections among Knox County students have swelled since the start of the school year. Under the second factor, the Court held an evidentiary hearing so that the parties could sufficiently develop the record on the issues relevant to the Court's determination of whether Plaintiffs are likely to succeed on the merits. And under the third factor, the evidence shows—as the Court will go on to discuss in detail—that Plaintiffs will suffer irreparable harm if it denies the injunctive relief they request at this stage in the proceedings.

### C.  Strong Likelihood of Success on the Merits

Again, Plaintiffs bring claims against Defendants under two statutes, the ADA and the Rehabilitation Act. The ADA is comprised of a "tripartite structure," *Marble v. Tennessee*, 767 F. App'x 647, 650 (6th Cir. 2019). Title I protects disabled individuals from discrimination in

---

[10] The late Justice John Paul Stevens described the second factor as "less important." *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 815 (2003) (Stevens, J., concurring).

the workplace; Title II protects their access to public services; and Title III protects their access to public accommodations. *Id.* (citing 42 U.S.C. §§ 12112, 12132, 12182). Plaintiffs are suing Defendants under Title II, [Am. Compl. at 1–2], which states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity," 42 U.S.C. § 12132.[11] And similarly, § 504 of the Rehabilitation Act states that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

The ADA and the Rehabilitation Act are "quite similar in purpose and scope," and an analysis of a claim under the ADA "roughly parallels" a claim under the Rehabilitation Act so that if "the plaintiff's ADA claim fails," then "the plaintiff's Rehabilitation Act claim must also fail." *McPherson*, 119 F.3d at 459–60, 463 (quotation omitted); *see Doe v. Salvation Army in U.S.*, 531 F.3d 355, 357 (6th Cir. 2008) ("We review claims brought under the Rehabilitation Act as we would claims brought under the Americans with Disabilities Act of 1990." (citation omitted)). The parties acknowledge the overlap that exists between analyses under the ADA and the Rehabilitation Act, and they do not move the Court to separately analyze Plaintiffs' claims under the ADA and the Rehabilitation Act, so the Court will analyze these claims together. *See S.S. v. E. Ky. Univ.*, 532 F.3d 445, 453 (6th Cir. 2008) (stating that "[w]e will . . . analyze [the

---

[11] The term "public entity" means "any State or local government" or "any department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. § 12131(1)(A)–(B). A "qualified individual with a disability" means a disabled person "who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." *Id.* § 12131(2). Defendants do not dispute that they are "public entit[ies]" or that Plaintiffs are "qualified individual[s] with a disability." *Id.*

plaintiff's] ADA and § 504 claims together" because the parties did not raise "the[] differences between" them).

Under Title II, a claim of discrimination "must relate to services, programs, or activities," language that "encompasses virtually everything that a public entity does," "subject . . . to the bounds of reasonableness." *Tri-Cities Holdings, LLC v. Tenn. Admin. Procedures Div.*, 726 F. App'x 298, 307–08 (6th Cir. 2018) (quotation omitted); *see Johnson v. City of Saline*, 151 F.3d 564, 571 (6th Cir. 1998) ("Title II is broadly applicable to all of the activities of a public entity."). Title II's text does not define the term "discrimination," but the Sixth Circuit has recognized a pair of legal theories by which a plaintiff can pursue a claim of discrimination: (1) intentional discrimination and (2) discrimination based on a public entity's failure to make a reasonable accommodation for an individual's disability. *Marble*, 727 F. App'x at 651; *McPherson*, 119 F.3d at 460. The second theory of discrimination originated from a regulation that the Attorney General, at Congress's instruction, issued to implement Title II's provisions. *Olmstead v. L.C ex rel. Zimring*, 527 U.S. 581, 592 (1999). That regulation provides that "[a] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7)(i).

Again, under a failure-to-accommodate claim, a plaintiff "asserts that the defendant 'could have reasonably accommodated [his or her] disability, but refused to do so.'" *Keller*, ___ F. App'x ___, 2021 WL 2411873 at *4 (quoting *McPherson*, 119 F.3d at 460). Plaintiffs, to obtain a preliminary injunction on their failure-to-accommodate claim, must establish a strong likelihood of success on the merits as to four elements: (1) they are disabled; (2) they were

23

"qualified" to participate in the "services, programs, or activities" of Knox County Schools; (3) they were "excluded from participation in" or "denied the benefits of" Knox County Schools' "services, programs, or activities"; and (4) this exclusion or denial occurred "by reason of" their disability. *Keller*, ___ F. App'x ___, 2021 WL 2411873 at *4 (quoting 42 U.S.C. § 12132) (citing *Ability Ctr. of Greater Toledo*, 385 F.3d at 909–10). Although Plaintiffs have to "show more than a mere possibility of success" as to these elements, *Six Clinics Holding Corp., II v. CAFCOMP Sys.*, 119 F.3d 393, 407 (6th Cir. 1997), they may meet their burden by "rais[ing] questions going to the merits so serious, substantial, difficult, and doubtful as to make them fair grounds for litigation and thus for more deliberate investigation," *id.* Defendants do not in any way contest the first and second elements. Instead, they contend that Plaintiffs fail to establish a strong likelihood of success on the merits under the third and fourth elements. *See* [Knox Cty. Bd. of Educ.'s Resp. at 9–19; Governor Lee's Resp. at 4–7, 12–17].

1. Excluded from Participation in or Denied the Benefits of Knox County Schools' Services, Programs, or Activities

When considering whether a disabled individual has been "excluded from participation in" or "denied the benefits" of a public entity's "services, programs, or activities," 42 U.S.C. § 12132,[12] the Sixth Circuit "interpret[s] this portion of Title II to require that covered entities provide 'meaningful access' to their services, programs, and activities," *Keller*, ___ F. App'x ___, 2021 WL 2411873 at *4 (citing *Ability Ctr. of Greater Toledo*, 385 F.3d at 909). "The phrase

---

[12] Under the Rehabilitation Act, the term "program or activity" means "all of the operations of . . . . a local educational agency (as defined in section 7801 of Title 20)[.]" 29 U.S.C. § 794(b)(2)(B); *see generally McPherson*, 119 F.3d at 460 ("[B]ecause the standards under" the ADA and the Rehabilitation Act "are largely the same, cases construing one statute are instructive in construing the other." (quotation omitted)); *see also* 20 U.S.C. § 7801(30)(A) ("The term 'local educational agency' means a public board of education or other public authority legally constituted within a State for either administrative control or direction of, or to perform a service function for, public elementary schools or secondary schools in a city, county, township, school district, or other political subdivision of a State, or of or for a combination of school districts or counties that is recognized in a State as an administrative agency for its public elementary schools or secondary schools.").

24

'meaningful access,'" however, "derives not from the text of the ADA or its implementing regulations, but from the Supreme Court's opinion in *Alexander v. Choate*, 469 U.S. 287, 105 S. Ct. 712, 83 L.Ed.2d 661 (1985)." *K.M. ex rel. Bright v. Tustin Unified Sch. Dist.*, 725 F.3d 1088, 1102 (9th Cir. 2013). In *Choate*, the Supreme Court addressed whether Tennessee's Medicaid program's cost-saving measures disproportionately affected disabled individuals under § 504 of the Rehabilitation Act. *Choate*, 469 U.S. at 289. In doing so, it interpreted § 504 as requiring "meaningful access to the benefit that the grantee offers," and in interpreting § 504 in this way, it turned to and relied on "[r]egulations promulgated by the Department of Health and Human Services (HHS) pursuant to the [Rehabilitation] Act." *Id.* at 301, 304–05.

 *Choate* is different from Plaintiffs' case because it dealt with meaningful access to health care and arose under a disparate-impact theory of discrimination, which Plaintiffs do not pursue here. *See generally McPherson*, 119 F.3d at 460 (recognizing that "it might be possible under the ADA for the plaintiff to rely on a disparate impact theory, but the plaintiff has specifically disavowed any reliance on a disparate impact theory, and it is not necessary for us to explore the availability and contours of such a claim in the ADA context" (internal citation omitted)). But even so, *Choate* is instructive because it shows that this Court must look to the regulations that are applicable to Title II—and more specifically to 42 U.S.C. § 12132—when considering the strictures of "meaningful access." *See generally* 42 U.S.C. § 12134(a) (directing the Attorney General to promulgate regulations implementing Title II); *Blum v. Bacon*, 457 U.S. 132, 141 (1982) ("[T]he interpretation of [the] agency charged with the administration of [this] statute is entitled to substantial deference.").

 Plaintiffs invoke four regulations in their pursuit of relief under the ADA. *See* [Am. Compl. ¶ 68a–d]. The first, 28 C.F.R. § 35.130(b)(7)(i), provides that "[a] public entity shall

make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." The second, 28 C.F.R. § 35.130(a), states that "[n]o qualified individual with a disability shall, on the basis of disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity." The third, 28 C.F.R. § 35.150(a), requires a public entity to "operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities."[13] And the fourth, 28 C.F.R. § 35.130(b)(3), provides:

> (3) A public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration:
> (i) That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability;
> (ii) That have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities[.]

C.F.R. § 35.130(b)(3)(i)–(ii).

---

[13] Section 35.150 primarily concerns physical, or structural, impediments to public access. *See* 28 C.F.R. § 35.150(b) ("A public entity may comply with the requirements of this section through such means as redesign or acquisition of equipment, reassignment of services to accessible buildings, assignment of aides to beneficiaries, home visits, delivery of services at alternate accessible sites, alteration of existing facilities and construction of new facilities, use of accessible rolling stock or other conveyances, or any other methods that result in making its services, programs, or activities readily accessible to and usable by individuals with disabilities."); *compare id.* (requiring public entities to meet the "accessibility requirements of" 28 C.F.R. § 35.150(b)), *with* 28 C.F.R. § 35.1501(a)(1)–(2) ("Each facility or part of a facility constructed by, on behalf of, or for the use of a public entity shall be designed and constructed in such manner that the facility or part of the facility is readily accessible to and usable by individuals with disabilities," except in "in those rare circumstances when the unique characteristics of terrain prevent the incorporation of accessibility features"); *see also Nat'l Fed. of the Blind v. Lamone*, 813 F.3d 494, 504 (4th Cir. 2016) (explaining that § 35.150 "is targeted principally at physical accessibility and allows a public entity to provide accessibility alternatives that would not require large-scale architectural modifications of existing facilities"); *Payan v. L.A. Cmty. Coll. Dist.*, Case No. 2:17-cv-01697-SVW-SK, 2019 WL 9047062, at *1 (C.D. Cal. Apr. 23, 2019) (citing various cases in which courts have ruled that § 35.150 applies to "cases involving physical barriers to program access, rather than deficiencies in the public entity's programs or services themselves" (citations omitted)).

When addressing claims under Title II, the Sixth Circuit, and other courts, have equated "meaningful access" with the term "reasonable accommodations," which is akin to the term "reasonable modifications" appearing in § 35.130(b)(7)(i). *See Ability Ctr. of Greater Toledo*, 385 F.3d at 907 (stating that "Title II . . . . requires that public entities make *reasonable accommodations* for disabled individuals so as not to deprive them of *meaningful access* to the benefits of the services such entities provide" (emphasis added)); *cf. Choate*, 469 U.S. at 301 (stating that "reasonable accommodations . . . may have to be made" to "assure meaningful access"); *Brooklyn Ctr. for Independence of Disabled v. Metro. Transp. Auth.*, ___ F.4th ____, 2021 WL 3713540, at *3 (2d Cir. 2021) ("To ensure 'meaningful access' a public entity must make 'reasonable accommodations in [its] program or benefit.'" (quoting *Choate*, 469 U.S. at 301)); *Robertson v. Los Animas Cty. Sheriff's Dep't*, 500 F.3d 1185, 1195 (10th Cir. 2007) (recognizing that the ADA mandates "*meaningful* access" and "[t]o effectuate this "mandate, the regulations require public entities to 'make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability'" (quoting 28 C.F.R. § 35.130(b)(7)(i))); *Theriault v. Flynn*, 162 F.3d 46, 48 (1st Cir. 1998) ("The protection afforded by the ADA is characterized as a guarantee of 'meaningful access' to government benefits and programs, which broadly means that public entities must take reasonable steps to ensure that individuals with disabilities can take advantage of such public undertakings." (internal citations omitted)); *see generally Nunes v. Mass. Dep't of Corrs.*, 766 F.3d 136, 145 n.6 (1st Cir. 2014) (recognizing that "there is no material difference" between the terms "reasonable modification" and "reasonable accommodation" (citing *Wong v. Regents of Univ. of Cal.*, 192 F.3d 807, 816 n.26 (9th Cir.1999))).

So the Court's inquiry is whether the Knox County Board of Education—in light of the heightened lethality that COVID-19 poses to Plaintiffs because of their disabilities—has made reasonable modifications to its policies, practices, or procedures so that Plaintiffs can safely access Knox County's public schools. And if the Knox County Board of Education has not made reasonable modifications or accommodations, it must then demonstrate that it is not bound to do so because those modifications or accommodations "would fundamentally alter the nature of" its programs and services. 28 C.F.R. § 35.130(b)(7)(i). According to Dr. Rysewik and Mr. Myers, the Knox County Board of Education has a policy under which it does not require its students to wear masks. [Hr'g Tr. at 180:20–21, 219:19–22]. In other words, masks are optional for students at Knox County Schools.

a.  *Reasonable Modification or Accommodation*

"The hallmark of a reasonable accommodation is effectiveness." *Wright v. N.Y. State Dep't of Corrs.*, 831 F.3d 64, 72 (2d Cir. 2016) (quotation omitted); *see U.S. Airways, Inc. v. Barnett,* 535 U.S. 391, 400 (2002) ("It is the word 'accommodation,' not the word 'reasonable,' that conveys the need for effectiveness."); *Keller*, ___ F. App'x ___, 2021 WL 2411873 at *4–6 (citing *Wright* repeatedly as precedential support). In this vein, "a reasonable accommodation 'need not be "perfect" or the one "most strongly preferred" by the [ ] plaintiff,'" *Keller*, ___ F. App'x ___, 2021 WL 2411873 at *4 (quoting *Wright*, 831 F.3d at 72)), but it must be effective enough to "adequately address" a disabled individual's "unique needs." *EEOC v. Ford Motor Co.*, 752 F.3d 634, 646 (6th Cir. 2014), *vacated en banc on other grounds*, 782 F.3d 783 (6th Cir. 2015). As for the Plaintiffs' unique needs in this case, the parties do not in any way dispute that Plaintiffs' medical conditions make them highly vulnerable to severe illness or death if they were to contract COVID-19 in school or any other setting. *See* [Dr. Yaun Decl. ¶ 18 (describing

28

the medical conditions in children that are likely to result in severe illness, hospitalization, and death from COVID-19)].

Again, Plaintiffs seek "a simple reasonable modification" to the Knox County Board of Education's policy on masking: "community masking," [*id.* ¶¶ 40, 60], which they describe as not only reasonable but also essential, [Pls.' Mem. at 12]. They maintain that the Knox County Board of Education, with the accommodations it has in place, "clearly has not managed . . . the rapid spread of COVID-19" in its schools. [*Id.* at 6]. In response, the Knox County Board of Education contends that Knox County Schools are "practicing the CDC's recommendations," including "three feet social distancing wherever possible," "intense cleaning protocols," "hand sanitizer in every classroom," and "recommended and encouraged masks for all." [Knox Cty. Bd. of Educ.'s Resp. at 14]. So in the Knox County Board of Education's view, it is "already providing a reasonable accommodation" and "no further accommodations are required by law." [*Id.* at 15]. Likewise, Governor Lee maintains that "Plaintiffs have not shown that" the Knox County Board of Education's accommodative "measures of risk mitigation other than mask wearing are ineffective." [Governor Lee's Resp. at 7].

But the evidence demonstrates that these accommodations have been far from effective and, therefore, far from reasonable. *See Wright*, 831 F.3d at 72 ("The hallmark of a reasonable accommodation is effectiveness." (quotation omitted)). While these accommodations do comply with some of the CDC's guidelines, they do not comply with *the* most important of the CDC's guidelines, which is mask-wearing, at least indoors. Dr. Yaun testified that mask-wearing is the "primary" way to mitigate the spread of COVID-19: "[O]ur primary recommendation, which is backed by the American Academy of Pediatrics and CDC, is for universal masking for all K through 12 students. That includes students, staff, teachers, visitors, really anyone that's in the

29

school building[.]" [Hr'g Tr. at 55:21–25]. In support of this testimony, Dr. Yaun cited multiple studies, including a comprehensive study from Duke University, which examined COVID-19's rate of transmission among 1.3 million children in fourteen school districts and thirteen states. [*Id.* at 58:2–25, 59:1–22]. According to Duke's study, when all students inside a school are wearing masks, only one out of every 3,000 students contracts COVID-19. [*Id.* at 59:6–7].

Dr. Ker's testimony was similar to Dr. Yaun's testimony. She recommend a "layered approach" to curbing the spread of COVID-19, [*id.* at 103:24], including "universal masking," "social distancing," and "all of the measures that have been outlined by the CDC," [*id.* at 103: 24–25, 104:1].[14] She was careful to point out, however, that a school system should not adopt a tailored approach to the CDC's guidelines. [*Id.* at 104:3–10]. In other words, a school system should not follow some of the CDC's guidelines at the exclusion of mask wearing because the exclusion of mask wearing "nullifies any attempt at keeping those vulnerable children safe." [*Id.* at 107:24–25].

Although Knox County Board of Education encourages students to wear masks, the evidence shows that the absence of a mask mandate is fueling infections inside Knox County Schools with frightening celerity. Ms. Paquette testified that "very few" students actually don masks. [*Id.* at 36:22–23]. She estimated that roughly ninety percent of students she encounters every day are not wearing them, [*id.* at 36:24–25, 37:1–5; Paquette Decl., Doc. 9-5, ¶ 4], and the Knox County Board of Education mustered no evidence to refute her testimony.[15] Also, her

---

[14] Dr. Lee testified that vaccination is the best way to fight COVID-19, [Hr'g Tr. at 103:15–16], but she acknowledged that vaccinated individuals who are not wearing masks can still spread the virus to others, [*id.* at 101:16–18]. The Knox County Board of Health therefore recommends masking indoors regardless of vaccination status. [*Id.* at 69:5–7].

[15] During Governor Lee's counsel's cross examination of Ms. Paquette, Ms. Paquette did acknowledge that she has not had occasion to observe whether students at the eighty-nine other schools in Knox County are or are not wearing masks. [Hr'g Tr. at 42:10–13]. But at the same time, neither Governor Lee nor the Knox County Board of Education provided the Court with any evidence to refute Ms. Paquette's testimony or to show that students in any of the other schools are following social-distance measures.

testimony that the sizeable majority of students are maskless in school is consistent with Dr. Yaun's testimony. Dr. Yaun testified that the number of infections are spiking in Knox County among school-age children. According to Dr. Yaun, infections in children between the ages of five and seventeen have "skyrocketed" since the start of the new school year in Knox County, with cases increasing at a rate of 600 percent per day. [Hr'g Tr. at 55:2–7].[16] Dr. Yaun said that, during the past week, Knox County is averaging 162 new cases a day among this age group—a figure that is "twice as [high] as any other time throughout the pandemic." [*Id.* at 55:3–5].[17]

The surge in infections is consistent with Dr. Ker's testimony. Dr. Ker testified, for example, that the Delta variant is "hugely transmissible," to an "alarming" degree. [*Id.* at 103:8–11]. Unlike the original COVID-19 strain, Delta has a "significant impact" on children because it "replicates so quickly" and produces "such a high amount of virus in [the] nose . . . that the immune system can't quite catch up to it." [*Id.* at 101:8–11]. Delta's "viral loads" are "so dramatically high," she said, that children carry large amounts of the virus and spread it more easily than the original strain. [*Id.* at 101:17–21].[18] According to Dr. Ker, if a maskless student infected with Delta stood shoulder to shoulder with 300 hundred mostly maskless students in a hallway, he or she could infect half of them. [*Id.* at 105:6–14].

In addition, the rise in infections is consistent with Ms. Paquette's testimony that Knox County Schools are not effectively practicing some of the accommodative measures that they claim to be practicing. For instance, Ms. Paquette testified that the administration at Farragut Intermediate told her and her fellow teachers that they "could group students," "push desks

---

[16] Dr. Yaun testified that he culled his data from state health departments, which "have data that is county specific." [*Id.* at 54:9–11]. He also testified that good independent sources of data include *The New York Times* and Covid Act Now, [*id.* at 54:11–14], and he pointed out that some school systems have developed "dashboards" that can be useful, [*id.* at 54:14–17].

[17] According to Dr. Yaun, "right now Tennessee for that age group, is actually the worst in the nation of cumulative cases per 100,000." [*Id.* at 55:10–12].

[18] Dr. Yaun testified that Delta is the predominant form of the virus in Tennessee. [*Id.* at 71:13–16].

31

together," and "conduct business as usual." [*Id.* at 39:13–14]. Along similar lines, she stated that each morning between 7:15 and 7:30 most of the teachers are not yet in their classrooms, so the students have to gather and wait in a t-shaped hall during a period known as "hall monitoring." [*Id.* at 36:2–15]. Roughly 300 in number, they stand "shoulder to shoulder" with each other, and only twenty or twenty-five of them have masks on. [*Id.* at 36:16–25, 37:1–3].

Ms. Paquette's testimony concerning the absence of social distancing among students is consistent, at least to an extent, with that of Mr. Myers, who testified that his "office fielded a couple of issues" involving social distancing, [*id.* at 238:11], though he has not heard of further issues since the end of August, when the Knox County Board of Education changed its policy on social distancing so that it became an "expectation," [*id.* at 238:13–19]. According to Mr. Myers, the Knox County Board of Education tasks the principals of each school with enforcing social distancing, but he could not identify any method of oversight that it has in place to ensure its principals are effectively enforcing social distancing in the schools. [*Id.* at 237:21–25, 238:1–16]. He testified that he performs "very little" oversight of social-distancing measures himself because he is "not in the schools every day." [*Id.* at 237:23–24].

So overall, from almost every angle, the record indicates that infections among school-age children in Knox County are charting an upward trajectory. Yet by the Knox County Board of Education's own tally, the rate of infections is infinitesimal. It provided the Court with a link to a website called "COVID Dashboard," where it posts the number of daily active COVID-19 cases among its student population, [Knox Cty. Bd. of Educ., Ex. 4], and as of September 14, 2021, the number of active cases was 298—meaning that 99.51 percent of its 60,000 students are COVID-*free*, [*id.*]. The juxtaposition of these numbers and Dr. Yaun's numbers creates an

almost black-and-white contrast, and the Court cannot accept two sets of numbers that lie on entirely opposite ends of the spectrum. Both cannot be accurate.

The Court is skeptical of, and unwilling to view as credible, the Knox County Board of Education's numbers for three reasons. First, the Court has to question why the Knox County Board of Education, on September 1, 2021, felt compelled to convene a special meeting on the topic of masking—especially with Executive Order No. 84 in effect—if the active cases among its student body was so tiny. Second, the Court found Dr. Yaun's testimony, and for that matter, Dr. Ker's and Ms. Paquette's testimony, to be totally credible. Third, the Knox County Board of Education acknowledges various shortcomings in its approach to reporting cases. Although it works with the Knox County Health Department to collect its numbers, it states that "there may be delays at every stage of the process," and "by the time some case subjects are interviewed, their case may exceed the 10-day symptom onset date, *which is how KCS classifies an active case.*" Knox County Schools, *District Statement on COVID Dashboard Data*, https://www. knoxschools.org/covid (Sept. 8, 2021) (emphasis added).

So in whole, the record evidence—i.e., the evidence that infections among school-age children have been meteorically rising since the new school year began in Knox County, that students in Knox County Schools are not wearing masks or practicing social distancing, and that the Knox County Board of Education has no immediate oversight over its own social-distancing policy—leads to only one conclusion: the accommodations currently in place against COVID-19 in Knox County Schools are too hazardously ineffective to address Plaintiffs' unique needs. This conclusion, and the evidence supporting it, is an attestation to the extreme contagiousness of the Delta variant and the reality that, among the unvaccinated, it is untamable without community-wide masking inside schools.

But the Court cannot ignore the Knox County Board of Education's assertion that it has provided Plaintiffs with an alternative accommodation: the opportunity to participate in classes virtually from home. *See Jones v. City of Monroe*, 341 F.3d 474, 481 (6th Cir. 2003) (considering "evidence of alternative accommodations" in determining whether the plaintiff had received meaningful access under Title II), *abrogated in part on other grounds by Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312 (6th Cir. 2012); *Neal v. Retro Reg'l Transit Auth.*, Case No. 5:18-cv-2402, 2019 WL 3753605, at *7 (N.D. Ohio Aug. 8, 2019) (stating that "[t]he Court can consider an entity's alternative services when determining whether a plaintiff has been denied meaningful access to the entity's provided services" (citing *id.*)); *compare Hankins v. The Gap, Inc.*, 84 F.3d 797, 800–01 (6th Cir. 1996) (stating that "an employee cannot make his employer provide a specific accommodation if another reasonable accommodation is instead provided" (citing *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 68–69 (1986))), *with McPherson*, 119 F.3d at 460 ("Not surprisingly, most of the law that has been made in ADA cases has arisen in the context of employment discrimination claims, but we have no doubt that the decisional principles of these cases may be applied to this case [involving Title II]."), *and Marble*, 767 F. App'x at 651 ("We turn to [employment discrimination cases under Title I] because we have had fewer opportunities to address reasonable-accommodation claims under Title II.").

Knox County Board of Education maintains that its virtual education program is a reasonable alternative accommodation to a mask mandate. It points out that, under the ADA, a disabled person is entitled only to a reasonable accommodation for his or her disability and not the best possible accommodation. [Knox Cty. Bd. of Educ.'s Resp. at 13–14]; *see Campbell v. Bd. of Educ. of the Centerline Sch. Dist.*, 58 F. App'x 162, 167 (6th Cir. 2003) (stating that the plaintiff "was entitled *only* to a 'reasonable' public accommodation of his disability" and "*not to*

34

the 'best possible' accommodation" (emphasis in original) (citation omitted)). The gestalt of its argument is that virtual schooling is an effective way of accommodating Plaintiffs' unique needs because it keeps them safe from COVID-19 while providing them with a public education. Plaintiffs do not argue that virtual schooling from their homes is an ineffective way to protect themselves from COVID-19. After all, Dr. Ker did agree that the best way for a medically compromised child to stay safe from COVID-19 is for him or her to enroll in virtual schooling. [Hr'g Tr. at 117:8–12]. Rather, Plaintiffs maintain that virtual schooling "is not a reasonable modification" because it denies them "equal access" to the school building, [Am. Compl. ¶ 55], and it is therefore "ineffective," [Pls.' Mem. at 12].

Again, the Supreme Court has recognized that Title II of the ADA "aim[s] to root out disability-based discrimination" by "enabling each covered person . . . to participate *equally* to all others in public facilities." *Fry*, 137 S. Ct. at 736 (emphasis added). In this vein, it has stated, perhaps somewhat clairvoyantly for purposes of this case, that "if [a] child cannot get inside [a] school," then "he may not achieve the sense of independence conducive to academic (or later to real-world) success." *Id.* at 756. This statement is on par with a sworn statement from Dr. Yaun:

> The consensus among pediatricians, policy experts, and educators is that in-person instruction is preferable when compared to online classes for education for a vast majority of students.
>
>     . . . .
>
>     All children and adolescents benefits from in-person school. The pandemic has taken a toll on children, and it is not just their education that has suffered but also their mental, emotional and physical health. The expert consensus from the American Academy of Pediatrics is that in-person learning is particularly important for educating young children in the pre-school and elementary school grades and students with disabilities as they are less likely to adapt to remote learning and more likely to require parental supervision while learning. Schools are safe, stimulating, and enriching places for teens and children to learn.

[Dr. Yaun Decl. ¶¶ 11, 23 (footnote omitted)]. Dr. Yaun's statement can only go so far with the Court, though, because it is a general statement and, under the ADA, Plaintiffs have to make a fact-specific showing that virtual schooling is not an alternative reasonable accommodation for them. *See Wilson v. Gregory*, 3. F.4th 844, 859–60 (6th Cir. 2021) (stating that the "determination of what constitutes reasonable modification is highly fact-specific, requiring case-by-case inquiry" (quotation omitted)). The Court therefore turns to the evidence to determine whether Plaintiffs have made this fact-specific showing.

In some ways, the Knox County Schools's virtual schools mimic their brick-and-mortar schools. Knox County Schools has three virtual schools—an elementary school, a middle school, and a high school—and all three have received approval from the state of Tennessee. [Hr'g Tr. at 186:13–15]. They have their own teachers, who have to meet the same licensure requirements as teachers in brick-and-mortar schools, their own administrative staff, and their own counselors. [*Id.* at 187:20–22, 188:3–10, 226:16–16]. Their curriculum is the same as the curriculum in brick-and-mortar schools, and they use the same textbooks. [*Id.* at 188:11–16, 226:11–13].

But in other ways, virtual schools have obvious differences from their brick-and-mortar counterparts. Students enrolled in virtual schooling are, of course, not physically present in the classroom with their teachers and fellow students; instead, they see into the classroom remotely through a computer screen. [*Id.* at 197:3–4, 201:1–8]. If they have a question for their teachers, they have to push a button that "kind of shows a hand raise." [*Id.* at 198:6–8]. They do not have the opportunity to eat lunch with, go to physical education with, or engage in extracurricular activities with their peers. [*Id.* at 204:2–11].

Aside from these basic differences between Knox County Schools' virtual schools and brick-and-mortar schools, Mr. Myers touched on logistical issues that confront students enrolled

36

in virtual schooling. Mr. Myers testified that students enrolled in virtual schooling are "required to have a caregiver" present with them to help them operate the software and navigate problems with the technology. [*Id.* at 235:17–21; *see id.* at 201:11–25, 202:1–25, 203:1–15]. His testimony makes Dr. Yaun's general statement—his statement that students enrolled in virtual schooling are "likely to require parental supervision while learning," [Dr. Yaun's Decl. ¶ 23]—relevant to the specific facts of this case. In a sworn statement, T.W.'s mother informed the Court that both she and her husband work, so they have to pay a caregiver to stay with T.W. because he cannot physically be in school. [T.W.'s Mother's Decl., Ex. 9-2, Doc. ¶ 6]. The fact that T.W.'s parents, and possibly other parents, have to pay caregivers to oversee their children so they can receive an education effectively converts their education from a free public education to a tuition-based education. And perhaps most importantly in terms of a fact-specific analysis, Plaintiffs are *still* required to enter their brick-and-mortar schools despite their status as virtually enrolled students because the state of Tennessee does not allow them to take state tests from home. [Hr'g Tr. at 189:3–5]. All this evidence, at a bare minimum, "raise[s] questions going to the merits so serious, substantial, difficult, and doubtful as to make them fair grounds for litigation" on the issue of whether virtual schooling is a reasonable alternative accommodation for Plaintiffs. *Six Clinics Holding Corp.*, 119 F.3d at 407. Plaintiffs have therefore presented sufficient evidence showing that virtual schooling is not a reasonable alternative accommodation.

### b. *Fundamentally Alter*

Again, 28 C.F.R. § 35.130(b)(7)(i) states that "[a] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, *unless* the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."

(emphasis added). "The public entity," in this case, the Knox County Board of Education, "bears the burden of proving that the accommodation would fundamentally alter" its service, program, or activity. *Tri-Cities Holdings*, 726 F. App'x at 315 (quoting *Jones*, 341 F.3d at 480). The Knox County Board of Education can dispatch its burden by charting one of two courses: it can show that a mask mandate is not a reasonable accommodation either because it (1) "imposes undue financial and administrative burdens" on it or because it (2) "requires a fundamental alteration in the nature of" its services, program, or activity. *Sch. Bd. of Nassau Cty. v. Arline,* 480 U.S. 273, 287 n.17 (1987) (quotations and internal quotation marks omitted)).

The Knox County Board of Education opts for the first direction, arguing that a mask mandate constitutes an unreasonable accommodation because it would saddle it with "an undue administrative burden" by impeding it in its "fundamental purpose" of providing "a free public education to all students enrolled in its district." [Knox Cty. Bd. of Educ.'s Resp. at 16–17]. In support of its argument, it asks the Court a series of rhetorical questions. "If the Plaintiffs' desired reasonable accommodation was provided," it asks, "what would happen when a student shows up at school without a mask?" [*Id.* at 16]. Would a staff member have to "strap a mask onto [the] student?" [*Id.*]. "Logically, that student is sent home for the day" and "is thereby deprived of" his or her constitutional right to a free public education. [*Id.*]. And what if "students and staff [have] disabilities that prevent them [from] wearing a mask?" [*Id.* at 17].

The evidence shows that the Knox County Board of Education already has policies and procedures in place that answer and address *all* these questions and concerns. The Knox County Board of Education seems to lose sight of the fact that just last school year, and as few as four months ago in May 2021, it *voluntarily* imposed a mask mandate for its students and staff. If a student failed to comply with it, his or her education was not in jeopardy; he or she was given a

warning. [Hr'g Tr. at 207:14–25, 208:1–10]. After a second act of noncompliance, the student receives a second warning. [*Id.* at 208:6–8]. The student is sent home only when noncompliant for a third time. [*Id.*]. If a student is noncompliant because he or she is unable to procure a mask or forgets to bring one to school, that occurrence poses no problem because the "majority of the schools" have masks on site for students. [*Id.* at 181:15–22].

If parents decline to send their children to school because they disagree with masking, the Knox County Board of Education has a response for that occurrence too. Mr. Myers testified that parents in Tennessee cannot legally refuse to send their children to school: "there would be ramifications for the family," including possible truancy fines or charges. [*Id.* at 216:24–25, 217:1–3]. But the record does not demonstrate that the Knox County Board of Education actually did experience any meaningful problems in response to last year's mask mandate. According to Mr. Myers, some parents strenuously opposed mask-wearing in schools, [*id.* at 222:24–25, 223:1], but even so, no parents actually withheld their children from school in protest of last year's mask mandate, and the "students who came to school, they wore masks," [*id.* at 216:12–23]. Similarly, Ms. Paquette testified that she did not encounter any serious issues with students refusing to comply with last year's mask mandate:

> Q. What would happen if you caught a student not wearing a mask?
>
> A: You know, just give them a friendly reminder of, you know—usually I would say to them, hi, friend, let's make sure our noses are covered, but in general it wasn't a problem.

[*Id.* at 33:25, 34:1–5].

As for the Knox County Board of Education's apprehension about "students and staff with disabilities that prevent them [from] wearing a mask," the record contains an answer for that scenario as well. [Knox Cty. Bd. of Educ.'s Resp. at 17]. Mr. Myers testified that last year's

39

mask mandate allowed for exemptions for certain students and staff who could not wear masks for medical reasons. [Hr'g Tr. at 223:2–14]. In this vein, Dr. Lee confirmed that a mask mandate would require exemptions for students and staff with specific medical conditions, [*id.* at 111:4–16], though Dr. Yaun clarified that "very few" conditions "would preclude a child from wearing a mask and needing an exemption," [*id.* at 77:5–7]. The fact that a mask mandate could not apply to every person would not vitiate its effectiveness because, as Dr. Lee stated, masking is a "numbers game." [*Id.* at 115:24]. In other words, the more people who wear masks, the more "significant" the reduction of infections will be. [*Id.* at 115:24, 116:1–2].

Simply, the Knox County Board of Education's contention that a mask mandate would cause it to endure an undue administrative burden is hyperbole. The Court strains to understand how a mask mandate would impose an undue burden on the Knox County Board of Education when it *voluntarily* adopted one for the entirety of the previous school year and had policies and procedures in place to address episodes of noncompliance—which the evidence shows were few in number if not nonexistent. The Knox County Board of Education lacks any evidence showing that it experienced an undue burden when implementing or enforcing last year's voluntary mask mandate or that it will have difficulty implementing or enforcing a mask mandate this year if one is reinstated, and it therefore fails to demonstrate that a mask mandate would fundamentally alter the nature of its services, programs, or activities.

Governor Lee, however, attempts to stand in on the Knox County Board of Education's behalf and aid it in meeting its burden by arguing that a mask mandate would be "overly broad, unnecessarily implicating many schools and children." [Governor Lee's Resp. 16]. But with this argument, he ignores the evidence showing that the Knox County Board of Education willfully implemented a mask mandate last year, already has policies and procedures in place to enforce a

40

mask mandate, and did not struggle to enforce those policies and procedures last year. Governor Lee also argues that a mask mandate could "invite litigation" from students who are unable to wear masks for medical reasons, [*id.*], but the evidence scuttles this argument too, because the Knox County Board of Education crafted medical exemptions to last year's mask mandate, and the Court sees no reason why it could not do so again if a mask mandate is reinstated.

Lastly, Governor Lee asserts that a mask mandate would "affect[] the practices of third parties, as it [would] require[] all children attending Knox County Schools to wear masks and it removes the right of all Knox County parents to make these decisions based on their child's particular needs." [*Id.*]. As support for this assertion, Governor Lee cites *Montenez-Denman v. Slater*, No. 98-4426, 2000 WL 263279 (6th Cir. 2000), in which the Sixth Circuit ruled that the ADA did not require an employer to provide an employee with a "fragrance-free work environment" because it was an "impractical and virtually impossible" accommodation. *Id.* at *2–3.

Governor Lee's argument is unpersuasive for at least three reasons. First, whether an accommodation would fundamentally alter the nature of a service, program, or activity is an analysis that applies to "the grantee" of that service, program or activity, which in this case is the Knox County Board of Education, not its students or their parents. *Sch. Bd. of Nassau Cty.*, 480 U.S. at 287 n.17. So whether an accommodation would cause "third parties" to endure an undue burden is irrelevant, as far as the ADA is concerned. Second, in seeking a mask mandate, Plaintiffs are not requesting a virus-*free* environment in their schools; rather, they are seeking a mask mandate to "mitigate the[] risk of" COVID-19, [Am. Compl. ¶ 37], and "mitigat[e] the transmission" of COVID-19, [Pls.' Mem. at 12].

41

Third, in contending, or suggesting, that the unreasonableness of a fragrance-free work environment means that a mask mandate is equally unreasonable in response to COVID-19 in school buildings, Governor Lee overlooks an obvious difference between *Montenez-Denman* and Plaintiffs' case. The plaintiff in *Montenez-Denman* had a mere "sensitivity" to fragrances in perfumes and colognes. *Montenez-Denman*, 2000 WL 263279 at *1. Plaintiffs, on the other hand, have medical conditions that would likely cause them to die from COVID-19. Governor Lee cannot seriously argue that these two cases, and the accommodations at issue in each, are alike. The plaintiff's requested accommodation of a fragrance-free environment in *Montenez-Denman* had virtually nothing do with the safety of the workplace, whereas Plaintiffs' requested accommodation of a mask mandate against COVID-19 has everything to do with the safety of access to school buildings.

When considering ADA claims, federal courts have demonstrated concern over whether accommodations for the disabled are in fact safe. *Cf., e.g.*, *Dickinson v. York*, 828 F. App'x 780, 781–82, 783–84 (2d Cir. 2020) (reversing summary judgment against a handicapped prisoner, who filed suit under the ADA and alleged that the prison's accommodation of a standard-issue uniform was unsafe because he could not wear it properly and loose material would get stuck in his wheelchair); *Medina-Rodriguez v. Fernandez Bakery, Inc.*, 255 F. Supp. 3d 334, 339, 343 (D. P.R. 2017) (declining to dismiss the plaintiff's ADA claim when the plaintiff alleged that, as a handicapped individual, he was unable to safely access a building because "barriers [to access] render[ed] the building unsafe," exposed him to moving traffic, and "depriv[ed] him 'of the meaningful choice of freely visiting the same accommodations readily available to the general public'"); *Polansky v. Wrenn*, Civil No. 12–cv–105–PB, 2012 WL 4748097, at *4 (D.N.H. Aug. 31, 2012) (stating that a handicapped inmate had "previously asserted a cognizable claim" under

42

the ADA because he alleged that the prison's accommodation of a handicapped shower was "unsafe" without a safety alarm system).

In sum, Plaintiffs have shown a strong likelihood of success on the merits as to whether the Knox County Board of Education, in not providing them with a reasonable accommodation, excluded them from participation in or denied them the benefits of its services, programs, or activities. In response, the Knox County Board of Education has failed to demonstrate that the reasonable accommodation that Plaintiffs request would fundamentally alter the nature of its services, programs, or activities by imposing an undue administrative burden on it. The Court must now proceed to an analysis of the fourth and final element of a failure-to-accommodate claim: causation.

### 2. By Reason of a Disability

For Plaintiffs to establish that they were "excluded from participation in" or "denied the benefits of" the Knox County Board of Education's services, programs, or activities "*by reason of*" their disabilities," 42 U.S.C. § 12132 (emphasis added), they have to show that the Knox County Board of Education failed to accommodate them with a mask mandate because of their disabilities, i.e., their medical conditions, *Thompson v. Williamson Cty.*, 219 F.3d 555, 557–58 (6th Cir. 2000). In attempting to make this showing, Plaintiffs essentially contend that the absence of a mask mandate is alone sufficient to establish that they suffered discrimination by reason of their medical conditions. *See* [Pls.' Mem. at 11 ("Plaintiffs are also being excluded 'by reason of' their disabilities. That is, these children are being subjected to increased risk of serious harm, due to their disabilities, merely by attending largely unmasked schools[.]"). The Knox County Board of Education disagrees, contending that they cannot establish "*actual* discrimination" and have shown only the "effect of" discrimination." [Knox Cty. Bd. of Educ.'s

43

Resp. at 11 (emphasis in original)]. According to the Knox County Board of Education, Plaintiffs need proof of "bad faith or gross misjudgment" to show discrimination and lack any evidence of either one. [*Id.* at 12]. Governor Lee joins in the Knox County Board of Education's argument, asserting that Plaintiffs' claim requires "sufficiently significant evidence of animus toward the disabled." [Governor Lee's Resp. at 14 (quotation omitted)].

But both the Knox County Board of Education and Governor Lee look past the fact that Plaintiffs' claim is not one of intentional discrimination but of failure to accommodate. Again, the Sixth Circuit recognizes two legal theories by which Plaintiffs can pursue their claim of discrimination under the ADA: (1) intentional discrimination and (2) failure to accommodate. *Marble*, 727 F. App'x at 651; *McPherson*, 119 F.3d at 460. Plaintiffs' claim is the second of the two, and courts in this circuit and elsewhere have roundly stated that evidence of unintentional discrimination is enough to support a failure-to-accommodate claim. *See Ability Ctr. of Greater Toledo*, 385 F.3d at 908–09 ("Congress advanced 'a more comprehensive view of the concept of discrimination' in Title II than one limited to the traditionally recognized categories of intentional and disparate impact discrimination," and "Title II prohibits public entities from denying, even unintentionally, qualified disabled individuals meaningful access to the services or benefits they provide." (quoting *Olmstead*, 527 U.S. at 598)); *id.* at 910 (stating that § 12132 "demands more of public entities than simply refraining from intentional[] discriminati[on]" (citation omitted)); *Henrietta D. v. Bloomberg*, 331 F.3d 261, 276 (2d Cir. 2003) ("A plaintiff can prevail [under § 12132] either by showing 'discrimination' or by showing 'deni[al of] the benefits' of public services.") (alterations in original) (quoting 42 U.S.C. § 12132))); *Washington v. Ind. High Sch. Athletic Ass'n*, 181 F.3d 840, 846 (7th Cir. 1999) ("We cannot accept the

44

suggestion that liability under Title II of the Discrimination Act must be premised on an intent to discriminate on the basis of disability.").

None of the cases that the Knox County Board of Education or Governor Lee relies on involves a failure-to-accommodate claim; they involve claims of intentional discrimination. The record evidence of the Knox County Board of Education's failure to provide the reasonable accommodation that Plaintiffs request—a mask mandate—is by itself evidence of disability discrimination. *See Keller*, ___ F. App'x ___, 2021 WL 2411873 at *4 ("We have previously recognized that refusal to provide a reasonable accommodation can serve as direct evidence of disability discrimination." (citing *Ability Ctr. of Greater Toledo*, 385 F.3d at 907–08)); *G.S by and through Schwaigert*, No. 2:21-cv-02552-SHL-ATC at 10 (stating that "[a] refusal to provide a reasonable accommodation can serve as direct evidence of disability discrimination" (citing *Roell v. Hamilton County*, 870 F.3d 471, 488 (6th Cir. 2017); *Ability Ctr. of Greater Toledo*, 385 F.3d at 907–08)); *Washington*, 181 F.3d at 848 ("The approach the Sixth Circuit has taken, and the approach we take, does not completely do away with a discrimination requirement. We simply hold that it is possible to demonstrate discrimination on the basis of disability by a defendant's refusal to make a reasonable accommodation."); *Ahlman v. Barnes*, 445 F. Supp. 3d 671, 692 (C.D. Cal. 2020) ("Indeed, the Ninth Circuit has held a defendant's failure to provide reasonable accommodations is 'sufficient to demonstrate discrimination "by reason of" disability.'" (quoting *McGary v. City of Portland*, 386 F.3d 1259, 1265–66 (9th Cir. 2004))). Plaintiffs have therefore shown a strong likelihood of success on the merits as to whether the Knox County Board of Education discriminated against them "by reason of their disability," 42 U.S.C. § 12132, and having done so, they have now shown a strong likelihood of success on the merits as to their failure-to-accommodate claim.

45

### D. Irreparable Harm to Plaintiffs

Having addressed Plaintiffs' likelihood of success on the merits of their claims, the Court next will consider whether Plaintiffs have shown that without a preliminary injunction they will suffer irreparable harm. "A showing of 'probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Lucero v. Detroit Pub. Schs.,* 160 F. Supp. 2d 767, 801 (E.D. Mich. 2001) (quoting *Reuters Ltd. v. United Press Int'l., Inc.*, 903 F.2d 904, 907 (2d Cir. 1990)); *see D.T. v. Sumner Cty. Schs.*, 942 F.3d 324, 326–27 (6th Cir. 2019) (stating that "even the strongest showing" on the other factors cannot justify a preliminary injunction without irreparable harm). Plaintiffs must establish that they are "likely" to suffer irreparable harm without a mask mandate, *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008), but the threat of irreparable harm must be more than "speculative or theoretical." *Sumner Cty. Schs.*, 942 F.3d at 327 (quotation omitted). Instead, it must be "both certain and immediate." *Id.* (quotation omitted).

Again, no one disputes that Plaintiffs are prone to a heightened risk of mortality from COVID-19—and perhaps an even greater risk of mortality from the Delta variant. *See* [Hr'g Tr. at 101:2–3, 102:1–11 (containing Dr. Lee's testimony that children who suffer from certain medical conditions like Plaintiffs' are "*much* more susceptible to morbidity and potentially mortality" from COVID-19 and that Delta has "really changed" the "game")]. The death of a child is irreparable, and none of the parties argues otherwise. *See Overstreet*, 305 F.3d at 578 (recognizing that "[a] plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages" (citations omitted)). The dispositive question for the Court, then, is whether Plaintiffs, while in their school buildings without a mask mandate in place, are likely to face a certain or immediate risk of contracting COVID-19.

46

Plaintiffs say yes, contending that they are "'sitting ducks' for COVID" because it is "raging in the schools." [Pls.' Resp. at 12]. In response, the Knox County Board of Education raises a twofold counterargument, asserting, first, that Plaintiffs' claim of irreparable harm is disingenuous because "[a]ny time [they] leave their home they will be around people who are choosing not to mask" and, second, that "there are still people who will be exempted from a mask mandate due to their own disabilities or medical needs, thereby still increasing the risk." [Knox Cty. Bd. of Educ.'s Resp. at 9]. But the first half of this argument is speculative, and the second half is of little consequence because Dr. Yaun testified that "very few" people would require a medical exemption from a mask mandate. [Hr'g Tr. at 77:5–7].

As for Governor Lee, he points out that T.W. and M.K. are currently attending school in person, so he argues that, "[t]o the extent that they claim they are at risk of contracting COVID, their actions show that they feel this risk can be acceptably mitigated without the need for a county-wide mask mandate." [Governor Lee's Resp. at 18]. But this argument is speculative, too, and the Court could just as easily speculate that T.W. and M.K. are attending school in person because their parents work during the day and cannot afford a daily caregiver, which is necessary for a child to participate in virtual schooling in Knox County. [Hr'g Tr. at 235:17–21]. Governor Lee also argues, however, that although "mask wearing is frequently recommended, the efficacy of mask mandates is not certain." [Governor Lee's Resp. 18].[19] To support this argument, he cites a report in which the CDC states that lower rates of transmission of COVID-19 "in schools that required mask use among students was not statistically significant compared with schools where mask use was optional." [*Id.* (citing Jenna Gettings et al., *Mask Use and*

---

[19] The Court cannot help but notice that, with this argument, Governor Lee is contradicting his prior public statement about the effectiveness of masks. *See* [Am. Compl. ¶ 40 (alleging that Governor Lee himself stated on August 25, 2021, that "[i]f you want to protect your kid from the [COVID-19] virus or from quarantine, the best way to do that is to have your kid in school with a mask.")].

*Ventilation Improvements to Reduce COVID-19 Incidence in Elementary Schools*, 70 Morbidity & Mortality Weekly Report 779, 783 (May 28, 2021), *available at* https://www.cdc.gov/mmwr/ volumes/70/wr/pdfs/mm7021e1-H.pdf)].[20]

But in making this statement, the CDC explained that the statistical insignificance may have been due to the fact that many or most students and staff actually *were* wearing masks in schools where mask use was optional. *See* Jenna Gettings et al., *Mask Use and Ventilation Improvements to Reduce COVID-19 Incidence in Elementary Schools*, 70 Morbidity & Mortality Weekly Report at 783 ("This [statistical insignificance] might be attributed to . . . differences in mask-wearing behavior among students in schools with optional requirements."). In fact, the CDC concluded that "universal and correct mask use" is an "important strateg[y] that could reduce SARS-CoV-2 transmission as schools continue, or return to, in-person learning." *Id.* at 784.

In resolving the unprecedented question of whether COVID-19 exposes Plaintiffs to a likelihood of irreparable harm inside their schools' walls, the most compelling argument on the table is Plaintiffs' reliance on *Helling v. McKinney*, 509 U.S. 25, 33 (1993). [Pls.' Mem. at 12]. In *Helling*, a state inmate sued the prison where the was housed and its officers under 42 U.S.C. § 1983, alleging that, in violation of the Eighth Amendment, they were deliberately indifferent to his serious medical needs because he was assigned to a cell with a fellow inmate who smoked five packs of cigarettes a day. *Helling*, 509 U.S. at 28. The inmate also sought an injunction. *Id.* The issue before the Supreme Court was whether the inmate had stated a sufficient claim for deliberate indifference under the Eighth Amendment by alleging that his involuntary exposure to environmental tobacco smoke posed an unreasonable risk to his health and future health. *Id.* at 32, 35. The Supreme Court ruled that the inmate's claim was sufficient. *Id.* at 35.

---

[20] The CDC conducted this study in Georgia, using data from kindergarten through fifth grade classes that opened for in-person learning in fall 2020.

48

*Helling*, of course, does not stand on all fours with the facts of Plaintiffs' case; no case does. But much of the Supreme Court's reasoning holds analogous value for Plaintiffs' case, and daresay, it cuts as close to the heart of Plaintiffs' case as any prior legal precedent can. And the fact that *Helling* deals with legal standards under the Constitution and not under the ADA does not dissuade the Court from extracting precedential value from it. The Court knows of no case law that would preclude a plaintiff from simultaneously bringing an Eighth Amendment claim and a failure-to-accommodate claim under ADA based on the same set of facts. *See United States v. Georgia*, 546 U.S. 151, 159 (2006) (holding that Title II of the ADA allows parties to bring a private suit against state actors when they violate the Eighth Amendment, and concluding that the circuit court of appeals "erred in dismissing [the plaintiff's] Title II claims that were based on such unconstitutional conduct").

In ruling in the inmate's favor, the Supreme Court in *Helling* stated that prison officials cannot "ignore a condition of confinement that is sure or very likely to cause serious illness," whether in "the next week or month or year." *Id.* at 33. The Supreme Court relied on its decision in *Hutto v. Finney,* 437 U.S. 678 (1978), in which prisoners "were crowded into cells and that some of them had infectious maladies such as hepatitis and venereal disease." *Id.* This situation in *Hutto*, the Supreme Court noted, "required a remedy," "even though" harm to the prisoners may not have been "immediate[]" and "even though the possible infection might not affect all of those exposed." *Id.* The Supreme Court went on to write:

> We would think that a prison inmate also could successfully complain about demonstrably unsafe drinking water without waiting for an attack of dysentery. Nor can we hold that prison officials may be deliberately indifferent to the exposure of inmates to a serious, communicable disease on the ground that the complaining inmate shows no serious current symptoms. . . . It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them.

49

Summarizing its reasoning, the Supreme Court then stated, "a remedy for unsafe conditions need not await a tragic event." *Id.*

While a school of course is not analogous to a prison, the close quarters that created risk for the prisoners in *Helling* and *Hutto* are also present in Plaintiffs' case, at least at times. Again, Ms. Paquette testified that 300 students stand shoulder to shoulder with each other in a hallway during hall monitoring, [Hr'g Tr. at 36:16–25, 37:1–3], and roughly ninety percent of them are maskless. [*id.* at 36:24–25, 37:1–5; Paquette Decl. ¶ 4]. She also said that the administration at Farragut Intermediate told her and her fellow teachers that they could "group students," "push desks together," and "conduct business as usual." [Hr'g Tr. at 39:13–14]. Dr. Ker testified that if a maskless student infected with Delta stood shoulder to shoulder with 300 hundred mostly maskless students in a hallway, he or she could infect half of them. [*Id.* at 105:6–14]. In support of her testimony, she relied on a CDC report that chronicled an encounter between an infected teacher and her students in Marin County, California. [*Id.* at 102:24–25, 103:1–8]. According to the report, the teacher removed her mask twice over the course of two days just to read to the students. [*Id.*]. Although all the children were masked, all the windows were open, and HEPA filters were present in the classroom, she still infected twelve out of her twenty-four students in the classroom. [*Id.*]. Dr. Yaun offered testimony that was similar to Dr. Ker's:

> In a class of, let's just say twenty people, if we have four students unmasked and one of those students is, you know, in that presymptomatic or asymptomatic phase and transmits to others, knowing what we know about the Delta variant, they could easily spread that to five, six, or seven other students whether [those] students are masked or not.

[*Id.* at 89:19–25].

Dr. Ker's and Dr. Yaun's testimonies about Delta's astonishing transmissibility raise a critical point about whom exactly a mask protects. Dr. Ker said that the concept of "universal

masking . . . gets confused" because some "people think that a mask can protect them" but "the wearer of the mask is only mildly protected." [*Id.* at 104:11–25]. In other words, the mask "does a better job of [preventing]" an infected individual "from spreading this virus." [*Id.* at 104:25, 105:1]. Dr. Yaun's testimony was identical to Dr. Lee's:

> The mask is primarily to protect others. I wear my mask to protect others I come into contact with. . . . The mask blocks the expellation the spread of those respiratory droplets that we spoke of earlier that are expelled and prevents them to getting to other presumably uninfected people. That's primarily the way masks work.

[*Id.* at 56:16–25, 57:1]. Masks, then, provide their wearers with only minimal protection against spread from infected, unmasked individuals. For this reason, Dr. Lee testified that the absence of a mask mandate "really nullifies *any* attempt at keeping those vulnerable children safe." [*Id.* at 107:24–25 (emphasis added)].

So in light of the evidence of slack social-distancing measures among students, Delta's extreme transmissibility, and the 600 percent daily hike in cases in Knox County's school-age children since the start of the school year, the risk of infection to T.W., M.K., and any other similarly situated individual with a right of access to Knox County's school buildings is neither speculative nor theoretical. It is real, and likely. Knox County students *are* being infected right now, every day, at a rate of 162 students every day, [*id.* at 55:3–5], and the threat of harm is therefore "immediate[]," "even [if] the possible infection might not affect all of those exposed." *Helling*, 509 U.S. at 503. "It would," indeed, "be odd to deny an injunction" when Plaintiffs have "plainly proved an unsafe, life-threatening condition in their [schools] on the ground that nothing yet had happened to them." *Id.* Whether the risk to Plaintiffs materializes in "the next week or month or year," that risk, nevertheless, will remain present every day when the school bell rings.

*Id.* Plaintiffs have therefore satisfied their burden of establishing that they are likely to suffer irreparable harm without a mask mandate.[21]

### E. Substantial Harm to Others

Next, Plaintiffs must show that a preliminary injunction would not result in substantial harm to others. When addressing whether a preliminary injunction would cause substantial harm to others, the Court may consider potential harm to non-parties and to Defendants. *See Ramik v. Darling Intern, Co.*, 161 F. Supp. 2d 772, 778 (E.D. Mich. 2001) ("[I]t appears that the issuance of the injunction would not cause substantial harm to non-parties, but it certainly would cause harm to Defendant." (citing *Chrysler Corp. v. Franklin Mint Corp.*, No. 93–2522, 1994 WL 378144, at * 2 (6th Cir. 1994)).

In arguing that a mask mandate would not cause substantial harm to others, Plaintiffs maintain that a mask mandate "would actually *protect* others," and they also point out that the University of Tennessee, "the state's flagship university of thousands of students," has adopted a mask mandate for students for the new academic year [Pls.' Mem. at 13 (emphasis in original)]. In response, the Knox County Board of Education recycles the same argument it employed in contending that a mask mandate would alter its programs, service, and activities by creating an undue administrative burden. *See* [Knox Cty. Bd. of Educ.'s Resp. at 20 (arguing that a mask mandate would "place substantial burdens on the school system" because it would create a "politicized atmosphere" in which some parents may not allow their children to attend school)]. The Court rejects this argument for the reasons it has already relied on.

---

[21] Unlike T.W. and M.K., S.B. and M.S. are not currently attending school in person; instead they are enrolled in virtual schooling. [*Id.* ¶¶ 20, 23]. The Court therefore cannot conclude that they are at the same risk of *immediate* harm from COVID-19. But because T.W. and M.K. ultimately meet their burden of establishing that they are entitled to a preliminary injunction, the Court will order the enforcement of a universal mask mandate that will nonetheless provide S.B. and M.S. with the relief that they too seek.

52

During the evidentiary hearing, Dr. Yaun described mask-wearing as "simple," and he debunked theories that masks are unsafe either because they contain germs or are harmful to the immune system. [Hr'g Tr. at 56:10, 63:18–25, 64:1–5]. Dr. Yaun also testified that students can wear any type of mask they like, whether it be a surgical mask or a cloth mask. [*Id.* at 60:13–24]. Although Dr. Lee testified that individuals with certain medical conditions, like a tracheotomy or autism, may have difficulty wearing masks, [*id.* at 111:4–9], the Court can permit exceptions to a mask mandate for these individuals. The Court, therefore, can identify no harm to others that would result from a mask mandate, and this factor weighs in favor a preliminary injunction.

### F.  The Public Interest

Lastly, as for the question of whether a preliminary injunction would serve the public interest, Plaintiffs argue that a preliminary injunction would serve the public interest because it would advance the ADA's mandate by providing Plaintiffs with a reasonable accommodation for their disabilities. [Pls.' Mem. at 13]. The Knox County Board of Education, however, asserts that a preliminary injunction would not be in the public interest because it would be a "judicial solution" to "a political question" and would "subvert [its] authority" to manage and control its school system. [Knox Cty. Bd. of Educ. at 20]. But the Court has already rejected the Knox County Board of Education's argument that Plaintiffs' claims require the Court to delve into a political question under the political-question doctrine.

As for Governor Lee, he argues that a preliminary injunction would not be in the public interest because it would "subvert[] the democratic process," which, he says, requires leaving the issue of mask mandates in the "hands of elected officials." [Governor Lee's Resp. at 20–21]. According to Governor Lee, "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." [*Id.* at 21 (quoting

*Maryland v. King*, 567 U.S. 1301, 1303 (2012) (opinion of C.J. Roberts)]. But what about when an elected official's actions frustrate a public entity seeking to prospectively comply with the ADA, or with any other federal law? *This* is the issue in this case, and it is one that is itself fraught with concerns over the guarantees of a democratic process. *See Milliken*, 433 U.S. at 289 (affirming an injunction requiring state officials to "conform their conduct to the requirements of federal law"). As the Ninth Circuit Court of Appeals aptly wrote more than two decades ago, in a case involving the legislative branch rather than the executive branch:

> We are mindful of the general principle that courts will not second-guess the public health and safety decisions of state legislatures acting within their traditional police powers. However, when Congress has passed antidiscrimination laws such as the ADA which require reasonable modifications to public health and safety policies, it is incumbent upon the courts to insure that the mandate of federal law is achieved.

*Crowder v. Kitagawa*, 81 F.3d 1480, 1485 (9th Cir. 1996) (citation omitted). Lastly, Governor Lee contends that a preliminary injunction is not in the public interest because it would divest parents of the right "to direct the education of their children." [Governor Lee's Resp. at 21]. But this contention falls back on his prior argument that this case involves a dispute over questions fundamental to education under the IDEA. This argument reads an attempt to recast Plaintiffs' claims in an image of Governor Lee's making, and so the Court says again: this case involves a dispute under the ADA over Plaintiffs' right to safe public access to their school buildings.

Plaintiffs have demonstrated a strong likelihood of success on the merits of their ADA claim, and a preliminary injunction would therefore serve the public interest by achieving the ADA's "broad mandate" to "'eliminate discrimination against disabled individuals," with the objective of "integrat[ing] them 'into the economic and social mainstream of American life.'" *Martin*, 532 U.S. at 675 (quotations omitted); *see Jones*, 341 F.3d at 490 (Cole, J., dissenting) (stating that "[t]he public interest is clearly served by eliminating the discrimination Congress

54

sought to prevent in passing the ADA"); *Thomas by and through Thomas v. Davidson Acad.*, 846 F. Supp. 611, 620 (M.D. Tenn. 1994) ("The Court concludes that there is a significant public interest in eliminating discrimination against individuals with disabilities, and that such public interest is advanced by issuing an injunction against Davidson Academy."). This factor therefore militates in favor of a preliminary injunction, as do the other three factors.

## IV. CONCLUSION

Under Federal Rule of Civil Procedure 65, Plaintiffs have met their burden of establishing that they are entitled to a preliminary injunction against the Knox County Board of Education and Governor Lee's Executive Order No. 84. The Court therefore **ORDERS** as follows:

1. Plaintiffs' motion for a preliminary injunction [Doc. 9] is **GRANTED**.

2. The Knox County Board of Education is hereby **ENJOINED** from enforcing its September 1, 2021 vote against a mask mandate in Knox County Schools.

3. The Knox County Board of Education is **ORDERED** to enforce—with immediate effect—the mask mandate that was in place in all Knox County Schools during the 2020-2021 school year, as a reasonable accommodation under the ADA for Plaintiffs and Class Plaintiffs.

4. Governor Lee is hereby **ENJOINED** from enforcing Executive Order No. 84 in Knox County or allowing parents in Knox County to opt out of the Knox County Board of Education's mask mandate.[22]

---

[22] Executive Order No. 84 will expire on October 5, 2021, but the Court has no information as to whether Governor Lee intends to renew it. [Executive Order No. 84 at 1].

5. Any individual with autism or a tracheotomy is hereby **EXEMPT** from the Knox County Board of Education's mask mandate.[23]

6. The Knox County Board of Education is **ORDERED** to identify, in a written filing with the Court, any other medical conditions that it believes may require exemptions from its mask mandate. The Knox County Board of Education is **ORDERED** to submit this filing to the Court within five days. Plaintiffs are **ORDERED** to respond to this filing within forty-eight hours.

7. This case will now proceed on the merits. *See Gooch v. Life Investors Ins. Co. of Am.*, 672 F.3d 402, 433 (6th Cir. 2012) ("[A] preliminary injunction makes a prediction about the merits ruling and is not itself a merits ruling.").

8. The Corrected Motion of Tennessee Chapter of the American Academy of Pediatrics and American Academy of Pediatrics for Leave to File as Amici Curiae in Support of Plaintiffs' Motion for Preliminary Injunction [Doc. 24] is **DENIED as moot**. The Tennessee Chapter of the American Academy of Pediatrics and the American Academy of Pediatrics, however, may move for leave to file an amici curia brief in response to any future motion in this case.

So ordered.

ENTER:

s/J. RONNIE GREER
UNITED STATES DISTRICT JUDGE

---

[23] Dr. Ker specifically identified individuals with autism and tracheotomies as disabled individuals who may be unable to wear a mask, but she identified no other medical conditions that would require an individual to be exempt from a mask mandate. [Hr'g Tr. at 111:7–9].